UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No. 08 CR 276 |
| | ) | Honorable Blanche Manning |
| WILLIAM COZZI | ) | |

DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR A TAINT HEARING, MOTION
FOR A VINDICTIVE PROSECUTION HEARING, MOTION FOR
DISCOVERY, MOTION TO SUPPRESS AND MOTION TO DISMISS

BACKGROUND

On August 2, 2005, one Randle Miles created a disturbance in the vicinity of 5300

W. North Avenue.  In the process, Miles suffered stab wounds.  Rather than immediately

seek medical assistance, Miles resorted to self-medication: a bottle of gin.  An ambulance

was summoned to the scene.  While waiting for the ambulance, Miles consumed the

spirits he had just purchased.  By the time the ambulance arrived, Miles was inebriated.

Chicago Fire Department Paramedics transported Miles to Norwegian American Hospital

in Chicago, Illinois.  *In re the Matter of Charges Filed Against P.O. William J. Cozzi*, 06

PB 2604, July 10, 2007 ("Exhibit A"), testimony of George Bedon, 25 – 31.

In the meantime, Defendant Cozzi, a decorated, Chicago police officer assigned to

the 25th District, was dispatched to investigate a stabbing incident at 5309 W. North

Avenue.  Cozzi arrived at the scene, but was unable to locate a stab victim.  As a result of

a radio transmission, Cozzi was rerouted to Norwegian American Hospital. *See* Office of

Emergency Management and Communication (OEMC) Tape Transcription, August 2,

2005 ("Exhibit B").

1

Miles was drunk, combative and abusive with paramedics and hospital personnel. Cozzi arrived at the hospital and found Miles causing a commotion in the emergency room. Miles was combative with hospital security guards. Cozzi placed Miles under arrest. *See* Exhibit A, testimony of Vicente Sebastian at 46-50 and Evelyn Estrada at 69-75.

Cozzi's alleged interactions with Miles on August 2, 2005 were recorded on hospital security cameras, and led the Cook County State's Attorneys Office to seek and obtain Cozzi's felony indictment. On December 28, 2005, the Cook County Grand Jury returned a 17-count indictment against Cozzi charging him, *inter alia*, with aggravated battery and official misconduct. *People v. Cozzi*, 06 CR 764-01, GJ-366, Indictment returned December 28, 2005 ("Exhibit C").

The Chicago Police Department's Office of Professional Standards ("OPS") also conducted an investigation. Pursuant to that investigation, Cozzi was compelled to give statements to an OPS officer on September 14, 20, and 21, 2005. "Administrative Proceeding Rights (Statutory)" forms ("Group Exhibit D").

On May 10, 2007, Cozzi pled guilty in the Circuit Court of Cook County to a reduced (misdemeanor) battery charge. The Honorable Michael Brown sentenced Cozzi to 18 months probation with conditions that he complete anger management classes and pay court fees. *People v. Cozzi*, 06 CR 764-01, Certified Copy of Conviction / Disposition ("Exhibit E").

The Superintendent of the Chicago Police Department filed charges seeking to separate Cozzi from the police department. Cozzi, however, desired to return to the police force, and resisted the discharge quest. *In re the Matter of Charges Filed Against*

*P.O. William J. Cozzi*, 06 PB 2604 (CR No. 307992), filed April 3, 2006 (See "Exhibit F").

On July 10, 2007 and August 17, 2007, a Chicago Police Board ("police board") Hearing Officer presided over public hearings on the Superintendent's complaint seeking Cozzi's separation from the police department.  Represented by the Corporation Counsel's office, the Superintendent called Cozzi as an adverse witness.  (Contained in redacted portions of Exhibit A; see also www.chicagojustice.org/foi/documents/Cozzi-HearingTranscripts.pdf.)

On July 10, 2007, the assistant corporation counsel asked Cozzi a series of questions about his compelled statements to the OPS.  The questioning related to Cozzi's compelled statements about the incident at issue in this indictment.  (Contained in redacted portions of Exhibit A; see also www.chicagojustice.org/foi/documents/Cozzi-HearingTranscripts.pdf.)

Transcripts of the police board hearing -- including Cozzi's testimony and his testimony about his OPS statements -- are in the public domain and available to the public.  Indeed, transcripts of the police board hearing are available on the Internet.  See www.chicagojustice.org/foi/documents/Cozzi-HearingTranscripts.pdf.

On October 18, 2007, the police board entered a 6-2 decision refusing to discharge Cozzi.  The police board ordered Cozzi suspended for a period of two years (from April 4, 2006 until April 3, 2008).  Cozzi planned on returning to police

department employment on April 3, 2008.[1]  *In re the Matter of Charges Filed Against P.O. William J. Cozzi*, 06 PB 2604, Decision entered October 18, 2007; Exhibit F.

The *Chicago Sun Times* obtained the hospital surveillance videotape through a Freedom of Information request.  Cozzi's case became a political issue in the 2008 primary race for Cook County State's Attorney.  Rossi, Rosalind.  "Taped beating a campaign issue:  Candidate says opponent backed reducing the charge, but she denies it." *Chicago Sun Times*, January 22, 2008 ("Exhibit G.").

An FBI agent named Jodi Weis was scheduled to become the Superintendent of the Chicago Police Department effective February 1, 2008.  Armed with the hospital surveillance tape, the media questioned Weis about Cozzi in January 2008.  Weis denounced Cozzi, expressed unhappiness with police board's decision not to terminate Cozzi and promised to thoroughly review the facts.  A police spokesperson was quoted as saying that Weis had requested a debriefing and planned to take a "hard, close look" at the Cozzi case.  Main, Frank.  "Another black eye:  Cop caught on tape beating man in wheelchair could be back on the beat in April.  Now, Chicago's new top cop says he will take a 'hard, close look' at the case."  *Chicago Sun Times*, January 21, 2008 ("Exhibit H.").

Unsatisfied with the punishment meted out by the police board and the Criminal Division of the Circuit County of Cook County, Weis referred the matter to the FBI. Rozas, Angela.  "Beating in wheelchair by Chicago cop leads to federal indictment." *Chicago Tribune*, April 4, 2008 ("Exhibit I.").

---

[1]     The Superintendent filed a complaint for administrative review of the police board's action with respect to Cozzi.  As of the time of this filing, that complaint was still pending in the Circuit Court of Cook County.  *Starks v. Cozzi*, 07 CH 34649.

On April 2, 2008, the government sought and obtained a one-count federal indictment against Cozzi for a civil rights violation.  Needless to say, Cozzi did not return to the police department's employment on April 3, 2008.

I.     **THIS CASE SHOULD BE SET DOWN FOR A TAINT HEARING RELATIVE TO ANY USE OF COZZI'S *GARRITY*-PROTECTED STATEMENTS**

A.     The Fifth Amendment to the United States Constitution provides in pertinent part, "No person *** shall be compelled in any criminal case to be a witness against himself."  This constitutional provision applies to compelled, incriminating, testimonial communications.  E.g., *United States v. Hubbell*, 530 U.S. 27, 35 (2000).  The protections of the privilege against self-incrimination are not limited "compelled testimony that is used against the defendant in the trial itself."  *Id*. at 37.  Rather, the coverage of the privilege against self-incrimination "encompasses compelled statements that lead to the discovery of incriminating evidence even though the statements themselves are not incriminating and are not introduced into evidence."  *Id*.  "The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime."  *Hoffman v. United States*, 341 U.S. 479, 486 (1951).  Compelled testimony that is not in itself incriminating but may lead to incriminating evidence falls within the scope of the privilege.  *Doe v. United States*, 487 U.S. 201, 208 n. 6 (1988).  The Fifth Amendment prohibits the prosecution from using incriminating information derived directly or indirectly from compelled testimony.  *Hubbell*, 530 U.S. at 38; *Kastigar v. United States*, 406 U.S. 441 (1972).

Over forty years ago, the United States Supreme Court in *Garrity v. New Jersey*, 385 U.S. 493 (1967), had the opportunity to discuss the privilege against self-incrimination in a case involving statements compelled from police officers. In *Garrity*, the Supreme Court of New Jersey commissioned the New Jersey Attorney General to conduct a special investigation into the fixing of traffic tickets. Under threat of termination from their police employment, police officers were compelled to answer questions regarding the ticket-fixing scheme. The officers were later indicted, and their statements were used against them at a criminal trial over objection.

The issue reached the United States Supreme Court, which observed that "policemen … are not regulated to a watered-down version of constitutional rights." *Id.* at 500. That is, a police officer's invocation of the privilege against self-incrimination cannot be met with the response of employment termination. See also *Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977). As stated in *Gardner v. Broderick*, 392 U.S. 273, 277 (1968), a public employee cannot not constitutionally be given the "Hobson's choice between self-incrimination and forfeiting [their] means of livelihood." The *Garrity* Court thus held that officers' statements, "obtained under threat of removal from office" could not be used against the officers in a subsequent criminal proceeding.

The protections of *Garrity* have been described as "self-executing immunity." *Wiley v. Mayor and City Council of Baltimore*, 48 F.3d 773, 778 (4th Cir. 1995) (Powell, retired U.S. Sup, Ct. J.); see also *Hester v. Milledgeville,* 777 F.2d 1492, (11th Cir. 1985); *Gulden v. McCorkle*, 680 F.2d 1070, 1074 (5th Cir. 1982). As stated in *Aguilera v. Baca*, 394 F.Supp.2d 1203, 1219-20 (C.D. Ca. 2005):

> Where the government compels a witness to testify against herself without officially granting the witness immunity, the witness is nevertheless shielded; the government may not use her testimony or any evidence derived from it in any subsequent criminal proceeding. See *Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). This immunity arises automatically and is co-extensive with the use and derivative use immunity mandated by *Kastigar*.
>
> * * *
>
> This is … so-called *Garrity* immunity … automatically attaches to compelled testimony.

See also *In re Federal Grand Jury Proceedings*, 975 F.2d 1488, 1490 (11th Cir. 1992) ("Immunity under *Garrity* prevents any statements made in the course of the internal investigation from being used against the officers in subsequent criminal proceedings.").

It is well-established that a grant of immunity must be co-extensive with the right to remain silent. *Kastigar*, 406 U.S. at 448-49, 459-61. For this reason, the prosecution is wholly precluded from making any direct use, or derivative use, of compelled testimony. See, e.g., *Gardner*, 392 U.S. at 278. There is a "total prohibition on use." *Kastigar*, 406 U.S. at 460. This "provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." *Id.*; see also *Braswell v. United States*, 487 U.S. 99 (1988). Proscribed use may also traverse into the non-evidentiary realm, as use of compelled testimony to develop leads, shape testimony, refresh recollection or influence prosecutorial strategy simply does not leave the declarant "in substantially the same position as if the [s/he] had claimed the Fifth Amendment privilege." *Id*. at 462; see *United States v. North* ("*North I*"), 910 F.2d 843, 861(D.C. Cir. 1990), *modified on reh'g*, 920 F.2d 940 (*per curiam*) ("*North II*") ("*Kastigar* does not prohibit simply 'a whole lot of use,' or 'excessive use,' or 'primary

use' of compelled testimony.  It prohibits 'any use,' direct or indirect.") (emphasis

original); see also *United States v. Ponds*, 454 F.3d 313, (D.C. Cir. 2006).

The scope *Garrity* immunity stands on the same plane as the immunity accorded

under the federal statutory law, 18 U.S.C. § 6002.  The court in *United States v.*

*Vangates*, 287 F.3d 1315, 1321 (11th Cir. 2002), captured this point:

> The state, of course, can compel a public employee to answer questions in
> a formal or informal proceeding by granting that employee immunity from
> future criminal prosecution based on the answers given.  See 18 U.S.C. §
> 6002; *Kastigar,* 406 U.S. at 462, 92 S.Ct. at 1666.  Such immunity is the
> equivalent of the protection afforded an officer under *Garrity*, and is
> referred to as "use immunity."  See *United States v. Veal,* 153 F.3d 1233,
> 1241 n. 7 (11th Cir.1998); *Hester,* 777 F.2d at 1496.

Once the defendant has established that he made compelled immunized

statements under *Garrity*, the burden shifts to the government to prove a legitimate,

independent source for its evidence.  See, *e.g.*, *United States v. Daniels*, 281 F.3d 168,

180-81 (5th Cir. 2002).  As stated in *Kastigar*, "One raising a claim under this statute need

only show that he testified under a grant of immunity in order to shift to the government

the heavy burden of proving that all of the evidence it proposes to use was derived from

legitimate independent sources."  406 U.S. at 461-62; see also *Murphy v. Waterfront*

*Commission*, 378 U.S. 52, 79 n. 18 (1964) ("Once a defendant demonstrates that he has

testified, under a state grant of immunity, to matters related to the federal prosecution, the

federal authorities have the burden of showing that their evidence is not tainted by

establishing that they had an independent, legitimate source for the disputed evidence.").

"This burden of proof … is not limited to a negation of taint; rather, it imposes on the

prosecution the affirmative duty to prove that the evidence it proposes to use is derived

from a legitimate source wholly independent of the compelled testimony."  *Kastigar*, 406

U.S. at 460. Furthermore, the "burden of disproving use cannot … be shifted onto the defendant, nor can the defendant be required to assume the burden of going forward with evidence that puts in issue the question of use." *North II*, 920 F.2d at 942.

When the government elects to prosecute a previously immunized witness, a pretrial adversarial hearing is the common method of determining whether the government can prove whether all its evidence was obtained from sources independent of the compelled testimony. *North II*, 920 F.2d at 944; *North I*, 910 F.2d at 872. The hearing must be comprehensive. As stated in *North I*:

> [T]he District Court must hold a full *Kastigar* hearing that will inquire into the content as well as the sources of the grand jury and trial witnesses' testimony. That inquiry must proceed witness-by-witness; if necessary, it will proceed line-by-line and item-by-item. For each grand jury and trial witness, the prosecution must show by a preponderance of the evidence that no use whatsoever was made of any of the immunized testimony either by the witness or by the Office of Independent Counsel in questioning the witness. This burden may be met by establishing that the witness was never exposed to North's immunized testimony, or that the allegedly tainted testimony contains no evidence not "canned" by the prosecution before such exposure occurred. Unless the District Court can make express findings that the government has carried this heavy burden as to the content of all of the testimony of each witness, that testimony cannot survive the *Kastigar* test. We remind the prosecution that the *Kastigar* burden is "heavy" not because of the evidentiary standard, but because of the constitutional standard: the government has to meet its proof only by a preponderance of the evidence, but any failure to meet that standard must result in exclusion of the testimony.

*Id*. at 872-73.

Finally, prior to the United States Supreme Court's decision in *Hubbell* the circuits had split on the issue of whether non-evidentiary use of immunized testimony violates the Fifth Amendment. See *North I*, 910 F.2d at 856-60. *North I* observed that non-evidentiary potentially includes "assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea bargain, interpreting evidence, planning cross-

examination, and otherwise generally planning trial strategy." *Id.* at 857 (quotations and citations omitted). *Hubbell* put to rest the notion that only evidentiary uses of immunized testimony violate the Fifth Amendment:

> *Kastigar* requires that respondent's motion to dismiss the indictment on immunity grounds be granted unless the Government proves that the evidence it used in obtaining the indictment and proposed to use at trial was derived from legitimate sources "wholly independent" of the testimonial aspect of respondent's immunized conduct in assembling and producing the documents described in the subpoena. The Government, however, does not claim that it could make such a showing. Rather, it contends that its prosecution of respondent must be considered proper unless someone-presumably respondent-shows that "there is some substantial relation between the compelled testimonial communications implicit in the act of production (as opposed to the act of production standing alone) and some aspect of the information used in the investigation or the evidence presented at trial." Brief for United States 9. We could not accept this submission without repudiating the basis for our conclusion in *Kastigar* that the statutory guarantee of use and derivative-use immunity is as broad as the constitutional privilege itself. This we are not prepared to do.

530 U.S. at 45-46.

B.      In this case, Cozzi has made a threshold showing that he previously made statements protected by immunity. More specifically, Cozzi was compelled to give statements to the OPS on September 14, 20, and 21, 2005. See Group Exhibit D. Furthermore, he was called as an adverse witness by the Corporation Counsel at the police board hearing on July 10, 2007. What's more, Cozzi's compelled statements were actually used at the police board hearing on July 10, 2007. See Exhibit A (testimony is contained within the redacted portion); see also www.chicagojustice.org/foi/documents/Cozzi-HearingTranscripts.pdf. As noted above, testimony from the police board hearing is in the public domain, and is even available on the internet.

Given that the government has elected to prosecute Cozzi after he made immunized statements, the burden shifts to the government to prove that each item of evidence used before the grand jury and to be used at trial was obtained from sources wholly independent of Cozzi's compelled testimony. Any attempt by the government to discharge this burden should come at a pretrial, adversarial hearing.

The hearing should also address whether any non-evidentiary uses of Cozzi's compelled statements have occurred. On the particular circumstances of this case, Cozzi notes that non-evidentiary uses would include Superintendent Weis's review of the Cozzi case and decision to refer this matter for Federal prosecution. Exposure to Cozzi's OPS statements or the police board record would constitute use of compelled statements.

Cozzi acknowledges that the discovery material provided to him by the government contains so-called "*Garrity* redactions." This, however, is insufficient to discharge the government's heavy burden, for it does not answer whether any evidentiary or non-evidentiary uses of Cozzi's compelled statements have been or will be made. Moreover, Cozzi is entitled to have his Fifth Amendment claim resolved at an adversarial hearing in which he is afforded the right of cross-examination. In short, the Fifth Amendment point must be resolved by a judicial officer after an evidentiary hearing, rather than on the basis of the government's representations about discovery.

Finally, in anticipation of the hearing, Cozzi respectfully moves this Honorable Court to require the government to provide Cozzi with all discovery relating to any efforts to disprove taint. Such discovery should include, but is not limited to:

    i.    All grand jury transcripts;

    ii.    All witness statements or summaries of witness statements;

11

iii.    All correspondence, memoranda, notes, documents, reports and e-mails etc. relating to Superintendent Weis's review of Cozzi's case;

iv.    The prosecution memo;

v.    All correspondence, memoranda, notes, documents, reports and e-mails etc. relating to the referral of this case; and

vi.    All correspondence, memoranda, notes, documents, reports and e-mails transmitted to the Federal Government by any State authority, including the Cook County State's Attorneys Office, the Chicago Police Department (including, but not limited to the OPS and the Superintendent's Office), and the police board.

## II.    THIS CASE SHOULD BE SET DOWN FOR A VINDICATIVE PROSECUTION HEARING

"To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978); s*ee also United States v. Goodwin*, 457 U.S. 368, 384 (1982) ("defendant in an appropriate case might prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do"); *United States v. Falcon*, 347 F.3d 1000, 1004 (7th Cir. 2003) ("A vindictive prosecution claim arises when the government pursues prosecution in retaliation for the exercise of a protected statutory or constitutional right."); see generally *United States v. Segal*, 495 F.3d 826, 832-33 (7th Cir. 2007); *United States v. Jarrett*, 447 F.3d 520 (7th Cir. 2006); *United States v. Bullis*, 77 F.3d 1553, 1558 (7th Cir. 1996); *United States v. Monsoor*, 77 F.3d 1031, 1034 (7th Cir. 1996).  A court should grant an evidentiary hearing when the defendant has offered "sufficient evidence to raise a reasonable doubt that the government acted properly."  *Falcon*, 347 F.3d at 1004.

In this case, the government did not seek an indictment against Cozzi until after he exercised his State law labor rights and resisted separation from the Chicago Police Department.  Indeed, the government sought and obtained an indictment the day before Cozzi suspension period ended!  District Court Document, 1 ("Exhibit J.").  Moreover, the Chicago Police Superintendent, who referred this case to Federal authorities, publicly expressed dissatisfaction with the Cozzi's return to the police department. Main, Frank. "Not sure 'if I was going to live or die':  Shackled to wheelchair, hit by officer." *Chicago Sun Times*, January 23, 2008 ("Exhibit K.").

Under these circumstances, there is no escaping the conclusion that the indictment in this case was brought in retaliation for Cozzi having exercised his rights under Illinois labor law. See *United States v. Napue*, 834 F.2d 1311, 1330 (7th Cir. 1987) ("[T]he extent to which the government had obtained its evidence prior to the defendant's assertion of some right is one of the key indicia scrutinized by the courts when confronted with a claim of vindictive prosecution."). At this juncture, Cozzi has proffered sufficient evidence of vindictive prosecution so as to require an evidentiary hearing on this issue.

III.    **FULL FAITH AND CREDIT PRINCIPLES BAR THIS FEDERAL PROSECUTION**

The State of Illinois has previously prosecuted and convicted Cozzi for the very same underlying facts at issue in the present federal indictment. See Exhibits C and E. To a layman, this federal prosecution would smack of double jeopardy. But Cozzi recognizes that the legal fiction known as the "dual sovereignty doctrine," *e.g.*, *Abbate v. United States,* 359 U.S. 189 (1959), *Bartkus v. Illinois*, 359 U.S. 121 (1959), generally forecloses an objection to the federal charges based upon the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. Nonetheless, dismissal of the present indictment is warranted on another constitutionally based theory – full faith and credit – which to date has not been addressed by the Supreme Court.

The United States Constitution contains a Full Faith and Credit Clause: "Full Faith and Credit shall be given in each State to the ... judicial Proceedings of every other State. And the Congress may by general laws prescribe the Manner in which such ... Proceedings shall be proved and the Effect thereof." U.S. CONST. art. IV § 1. Although the constitutional text does not address the federal government's recognizing state judgments, Congress has acted in the area. Title 28, United States Code, section 1738, provides in pertinent part: "[J]udicial proceedings ... shall have the same full faith and credit in every court within the United States ... as they have by law or usage of the courts of such State ... from which they are taken."

Applying the literal terms of this statute, this federal prosecution of Cozzi should be barred. Illinois double jeopardy law and usage would preclude Illinois from re-prosecuting Cozzi for his conduct in relation to Miles on August 2, 2005. By 28 U.S.C. § 1738, the United States is required to give the same full faith and credit to the Illinois

judgment.[2]  A federal prosecution, where the underlying facts have already been

prosecuted to judgment by a State within the Union, violates the full faith and credit

statute, to say nothing of comity and *res judicata* interests, and the *Petite* policy, see

*Petite v. United States*, 361 U.S. 529 (1960), and *Rinaldi v. United States*, 434 U.S. 22

(1977).  See Note, *Heath v. Alabama: Contravention of Double Jeopardy and Full Faith

and Credit Principles,* 17 Loy. L. J. 721 (1986); but see *Turley v. Wyrick*, 554 F.2d 840,

842 (8th Cir. 1977).

Respectfully submitted,

/s/ Terence P. Gillespie

TERENCE P. GILLESPIE
WILLIAM R. SULLIVAN
GENSON & GILLESPIE
53 W. Jackson Suite 1420
Chicago, IL 60604
(312) 726-9015

---

[2]      The Supreme Court has applied full faith and credit concepts in the criminal context.  *See Allen v. McCurry*, 449 U.S. 90 (1980) (full faith and credit statute precluded plaintiff in a 1983 action from relitigating the constitutionality of a search and seizure where a state court already had resolved the issue in a criminal pretrial suppression hearing); *Williams v. North Carolina*, 317 U.S. 287 (1942) (defendant's bigamy convictions reversed; Full Faith and Credit Clause required North Carolina to give preclusive effect to Nevada's divorce decrees).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify Defendant's foregoing Defendant's Memorandum of Law in Support of Motion for a Taint Hearing, Motion for a Vindictive Prosecution Hearing, Motion for Discovery, Motion to Suppress and Motion to Dismiss was served on June 2, 2008, in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the District Court's system as to ECF Filers.

 /s/ Terence P. Gillespie
TERENCE P. GILLESPIE
Attorney for Defendant, William Cozzi

TERENCE P. GILLESPIE
WILLIAM R. SULLIVAN
GENSON & GILLESPIE
53 W. Jackson Blvd., Suite 1420
Chicago, Illinois 60604
(312) 726-9015

1          BEFORE THE POLICE BOARD
              OF THE CITY OF CHICAGO
2
IN THE MATTER OF CHARGES    )
3  FILED AGAINST             ) Case No. 06-2604
   P.O. WILLIAM J. COZZI.    )
4

5          VIDEOTAPED REPORT OF PROCEEDINGS had at

6  the status in the above-entitled matter before

7  THOMAS JOHNSON, Hearing Officer, at 30 North

8  LaSalle Street, Suite 1240, Chicago, Illinois,

9  on July 10, 2007, at the hour of 10:00 a.m.

10         - - - - - - - - - - - - - -

11 APPEARANCES:

12     CITY OF CHICAGO
       DEPARTMENT OF LAW
13     LABOR DIVISION
       BY:  MS. SAIRA J. ALIKHAN
14          30 North LaSalle Street, Suite 1020
            Chicago, Illinois 60602
15
                on behalf of the Superintendent;
16

17     MR. WILLIAM N. FAHY
       53 West Jackson, Suite 1650
18     Chicago, Illinois 60604

19              on behalf of the Respondent.

20     POLICE BOARD OF THE CITY OF CHICAGO
       MR. MAX CAPRIONI
21
       A-1 LEGAL VIDEO,
22          SCOT ZIARKO

23

24

ORIGINAL

INDEX

WITNESS:                                                    PAGE:


William      DIRECT EXAMINATION                              12
Cozzi        BY MS. ALIKHAN
George       DIRECT EXAMINATION                              23
Bedon        BY MS. ALIKHAN
             CROSS-EXAMINATION                               29
             BY MR. FAHY
Erika        DIRECT EXAMINATION                              35
Garduno      BY MS. ALIKHAN
             CROSS-EXAMINATION                               42
             BY MR. FAHY
Vicente      DIRECT EXAMINATION                              46
Sebastian    BY MS. ALIKHAN
             CROSS-EXAMINATION                               54
             BY MR. FAHY
             REDIRECT EXAMINATION                            63
             BY MS. ALIKHAN
Evelyn       DIRECT EXAMINATION                              68
Estrada      BY MS. ALIKHAN
             CROSS-EXAMINATION                               79
             BY MR. FAHY
             REDIRECT EXAMINATION                            86
             BY MS. ALIKHAN
             RECROSS-EXAMINATION                             90
             BY MR. FAHY
William      DIRECT EXAMINATION [Resumed]                    97
Cozzi        BY MS. ALIKHAN
Ralph Snow   DIRECT EXAMINATION                             121
             BY MS. ALIKHAN
             CROSS-EXAMINATION                              125
             BY MR. FAHY

                         *****


Superintendent's Exhibit Nos. 3, 4, 5 received            118
Superintendent's Exhibit No. 1 received                   131

                         *****

Cozzi                                        000471

1              HEARING OFFICER JOHNSON:  All right.

2    We're calling the case of Police Officer

3    William J. Cozzi, 06-2604.  And let me ask at

4    the outset, Officer Cozzi, whether you

5    acknowledge receipt of a copy of the charges at

6    least five days prior to today's date.

7              OFFICER COZZI:  Yes, sir.

8              HEARING OFFICER JOHNSON:  And do you

9    waive reading of the charges and enter a plea

10   of not guilty to each and every charge?

11             OFFICER COZZI:  Yes, sir.

12             HEARING OFFICER JOHNSON:  Okay.  Let

13   me also tell you at the outset that if and only

14   if the Police Board finds you guilty of any

15   charge, then it will look at your complimentary

16   and disciplinary history.  You lawyer should

17   have a copy of that.

18             If that complimentary and

19   disciplinary history is incorrect in any

20   respect, then let me know either through

21   counsel or through your testimony before the

22   case is over, okay?

23             OFFICER COZZI:  Yes, sir.

24             HEARING OFFICER JOHNSON:  All right.

1    Any preliminary motions or stipulations?

2              MS. ALIKHAN:  I don't have any.

3              HEARING OFFICER JOHNSON:  Okay.  And

4    I've already asked the people in the room

5    whether they're going to be witnesses.  They

6    say they are not so --

7              MR. FAHY:  That would be my only

8    motion is to exclude witnesses.

9              HEARING OFFICER JOHNSON:  Okay.  And

10   that would be allowed.

11             All right.  Does the City wish to

12   make an opening statement?

13             MS. ALIKHAN:  Yes.  Members of the

14   Board, Mr. Hearing Officer, Opposing Counsel,

15   my name is Saria Alikhan and I represent the

16   Superintendent in the matter of charges against

17   Officer William Cozzi.

18             On August 2nd, 2005 Officer Cozzi

19   responded to a call from the Office of

20   Emergency Management Center.  The call informed

21   Officer Cozzi of a stabbing that occurred at

22   5309 West North Avenue.

23             When Mr. Cozzi arrived on the

24   scene, he learned that the stabbing victim, now

1   known as Randall Miles, had been transported to

2   Norwegian American Hospital.

3                    When Officer Cozzi arrived at the

4   hospital, he entered into the lobby section of

5   the emergency room.  While there, he saw a

6   nurse attempting to treat Mr. Randall.  You

7   will learn that Mr. Miles -- pardon me.

8   Mr. Miles.

9                    You will learn that Mr. Miles was

10  loud and uncooperative while being treated at

11  Norwegian American Hospital.  You will hear

12  throughout the hearing that Mr. Miles was in no

13  way physically threatening.  You will hear that

14  at some point Officer Cozzi placed Mr. Miles

15  under arrest.

16                   You will see video of the

17  incident, and the video and testimony will show

18  that while Mr. Randall was handcuffed in a

19  wheelchair, and while his feet were shackled to

20  that wheelchair, Officer Cozzi struck Mr. Miles

21  about the face and chest numerous times.

22                   The evidence will show that

23  Officer Cozzi struck Mr. Miles about the face

24  and chest with an unauthorized weapon, that

1    being a blackjack.  The evidence will show that

2    Mr. Miles was restrained the whole time that he

3    was being hit by Mr. Cozzi.  The evidence will

4    show that the actions of Officer Cozzi were in

5    no way justified, nor were they reasonable.

6              You will also learn that

7    subsequent to the incident, Officer Cozzi

8    filled out various official documents

9    concerning the incident.  These documents

10   include a general case report, an arrest

11   report, and a tactical response report.

12             The evidence will show that

13   Officer Cozzi included false and inaccurate

14   information in those documents.  The evidence

15   will show that Officer Cozzi fabricated those

16   facts to justify the degree of force he used.

17             As a result of this conduct,

18   Mr. Cozzi or Officer Cozzi has been charged

19   with various violations of the Police rules and

20   regulations, that being Rule 1 entitled

21   Violation of Any Law or Ordinance.  Because of

22   Officer Cozzi's actions on or about August 2nd,

23   2005 at Norwegian American Hospital, Officer

24   Cozzi committed the offense of aggravated

1   battery in that he intentionally and knowingly

2   without legal justification caused bodily harm

3   to Randall Miles by striking Mr. Miles about

4   the head or body with a blackjack in violation

5   of 720 ILCS 5/12-4 C1.

6                You will learn that Officer Cozzi

7   on August 2nd, 2005 committed the offense of

8   aggravated battery in that he intentionally or

9   knowingly without legal justification caused

10  bodily harm to Randall Miles by striking

11  Mr. Miles about the head in a public way on

12  public property or public place of

13  accommodation in violation of 720 ILCS 5/12-4

14  C8.

15                You will learn that Mr. Cozzi --

16  Officer Cozzi, pardon me, on August 2nd, 2005

17  committed the offense of battery in that he

18  intentionally or knowingly without legal

19  justification caused bodily harm to Randall

20  Miles by striking him about the head in

21  violation of 720 ILCS 5/12-3A1.

22                You will learn that on August 2nd,

23  2005 Officer Cozzi committed the offense of

24  battery in that he intentionally or knowingly

1    without legal justification made physical

2    contact of an insulting or provoking nature

3    with Randall Miles by striking Mr. Miles about

4    the head or body in violation of 720 ILCS,

5    5/12-3A2.

6              You will learn that Officer Cozzi

7    violated Rule 2 of the Police rules and

8    regulations which is any action or conduct

9    which impedes the Department's efforts to

10   achieve its policy or goals or brings discredit

11   upon the Department.  Officer Cozzi did this on

12   August 2nd, 2005 by striking Randall Miles

13   about the head or body with a blackjack.

14             You will also hear that Officer

15   Cozzi violated Rule 2 in that while on duty he

16   was in possession of an unauthorized weapon not

17   prescribed by the Chicago Police Department.

18             You will learn that Officer Cozzi

19   violated Rule 2 in that he generated one or

20   more reports containing false information

21   concerning his arrest of Randall Miles.

22             Officer Cozzi's conduct, you will

23   learn, also violated Rule 6 of the Police rules

24   and regulations in that his conduct resulted in

1    disobedience of an order or directive, whether

2    written or oral.

3              He did this on August 2nd, 2005 by

4    being in possession of a weapon not prescribed

5    by the Chicago Police Department in violation

6    of General Order 98-10-03, Paragraph 2(g) and

7    3(c).

8              You will learn that Officer

9    Cozzi's conduct is in violation of Police rules

10   and regulations, Rule 8 specifically, in that

11   his conduct was disrespect -- resulted in

12   disrespect to or maltreatment of any person

13   while on or off duty.

14             Officer Cozzi's conduct on

15   August 2nd, 2005 of striking Randall Miles in

16   the head with a blackjack or flat sap is one

17   instance in which a Rule 8 violation can be

18   found.

19             You will learn that Officer Cozzi

20   violated Rule 9 in that he engaged in

21   unjustified verbal or physical altercation with

22   any person by on August 2nd, 2005 striking

23   Randall Miles about the head or body with the

24   blackjack or flat sap.

1          Officer Cozzi is charged with

2     Rule 14 of the Police rules and regulations,

3     making a false report, written or oral in that

4     on August 2nd, 2005 Officer Cozzi generated one

5     or more reports containing false information

6     concerning his arrest of Randall Miles.

7          At the conclusion of this case,

8     the Superintendent asks this Board to find

9     Officer Cozzi in violation of all rules and to

10    separate Officer Cozzi from the Chicago Police

11    Department.

12          HEARING OFFICER JOHNSON:  Okay.  Thank

13    you.  Respondent wish to make an opening?

14          MR. FAHY:  Yes.  I'll be brief.  Good

15    morning, Mr. Johnson, members of the Board

16    also.

17          Mr. Cozzi -- Officer Cozzi has

18    served his department, the Police Department

19    with distinction for approximately 15 years.

20    He's 50 years old as he sits here today.  He's

21    educated.  He has served in the military, and

22    he has no history of any disciplinary problems

23    with the Department.

24          The incident you're going to hear

1    about was a complete aberration for Officer

2    Cozzi.  I do expect that the evidence is going

3    to show that Officer Cozzi did commit some

4    rules violations.  And he truly regrets some of

5    the actions that he took with regards to this

6    incident, and he will testify and try to

7    explain as best as he could or as best that he

8    can why he did what he did.

9              And essentially, the reason for

10   this hearing today is we do not agree that what

11   happened here warrants the sanction of

12   termination from the Department.  It was a

13   serious lapse in judgment.  An incident that

14   took a matter of a couple of minutes in what

15   has otherwise been a stellar 15-year police

16   career.  We're going to ask that you consider

17   that entire career when making your decision.

18              He is remorseful for what he did.

19   And at the conclusion of all the evidence,

20   we're going to ask that the Board impose a

21   suspension rather than terminating Officer

22   Cozzi from his position.  Thank you.

23        HEARING OFFICER JOHNSON:  Okay.  Thank

24   you very much.  All right.  City wish to call

REDACTED

PP 12 - 21

REDACTED

17 | City wish to call its next witness?

18 |         MS. ALIKHAN:  Yes.  City would like to

19 | call Ericka Garduno.

20 |         HEARING OFFICER JOHNSON:  You want to

21 | take a seat, and there's a microphone right

22 | here.  If you can pinch this onto your shirt.

23 | Okay.

24 |         MS. ALIKHAN:  We're actually going to

23

1    call George Bedon.

2              HEARING OFFICER JOHNSON:  Okay.  You

3    want to swear the witness.

4                   (The witness was duly sworn.)

5              GEORGE BEDON,

6    called as a witness herein, having been first

7    duly sworn, was examined and testified as

8    follows:

9              DIRECT EXAMINATION

10   BY MS. ALIKHAN:

11       Q.   Please state and spell your name for

12   the record.

13       A.   First name is George.  Last name is

14   Bedon, B as in boy, E, D as in dog, O-N.

15       Q.   Are you employed, Mr. Bedon?

16       A.   Yes, I am.

17       Q.   Where are you employed?

18       A.   Chicago Fire Department.

19       Q.   And how long have you worked for the

20   Chicago Fire Department?

21       A.   Till this date, 12 years.

22       Q.   12 years.  What is your position at

23   the Chicago Fire Department?

24       A.   Paramedic in charge.

1    Q.    And how long have you been paramedic

2    in charge?

3    A.    Almost nine years.

4    Q.    And describe your duties as paramedic

5    in charge.

6    A.    I am in charge of my partner, who was

7    the paramedic.  I'm in charge of the patient in

8    the back.  I assume all responsibilities

9    throughout the whole day, journal-wise,

10   paperwork.  Everything comes down on me as the

11   officer for that day.

12   Q.    Okay.  So you said you're in charge of

13   the patient in back.  Are you referring to an

14   ambulance?

15   A.    Yes.

16   Q.    Now, Mr. Pedon, do you recall an

17   incident that occurred on August 2nd, 2005 at

18   Norwegian American Hospital?

19   A.    Yes.

20   Q.    Okay.  And prior to Norwegian American

21   Hospital, where were you before that incident?

22   A.    In quarters.

23   Q.    You were in court?

24   A.    In quarters.  In --

25

```
 1              HEARING OFFICER JOHNSON:  In quarters?
 2              THE WITNESS:  Rephrase the question.
 3    I mean, we had -- we responded to a call.
 4    BY MS. ALIKHAN:
 5        Q.    Okay.  Yeah, let me take you from
 6    there.
 7        A.    Yeah, take me from there.
 8        Q.    Okay.  Where you said you responded to
 9    a call, can you describe what that call was
10    for?
11        A.    We were in quarters.  The tones went
12    off.  The call was for a stabbing.
13        Q.    The call was for a stabbing.  And
14    where did you respond?
15        A.    Somewhere on North Avenue.  I don't
16    have my run sheet in front of me.
17        Q.    What happened when you got to North
18    Avenue?
19        A.    We confronted -- we met with a patient
20    that told us he got stabbed by his girlfriend.
21    And we asked him where he got stabbed, and he
22    pointed to his arm.  And it wasn't a stabbing.
23    It was more like a slash.
24        Q.    Okay.  And what happened after that?
```

1      A.   We asked him to come to the ambulance,

2   and he was very rude and obnoxious and

3   belligerent with us.

4      Q.   When you say rude and obnoxious, what

5   do you mean?

6      A.   He was swearing.  He didn't believe

7   this could happen, you know, that night from

8   his girlfriend, and he wanted to go back up.

9   And we said we got to go.  You got stabbed.

10   Let's go.

11      Q.   Okay.  So did he get into the

12   ambulance at any point?

13      A.   It took a while.  It took about maybe

14   about 15, 20 minutes to get him inside there.

15      Q.   How did you get him in the ambulance?

16      A.   We had to persuade him, coerce him a

17   little bit.

18      Q.   Okay.  When he got into the ambulance,

19   what happened?

20      A.   He was kind of wild.  Like I said, he

21   was belligerent towards us and my partner.  And

22   we just kind of calmed him down a little bit,

23   and then said get you to the hospital, get you

24   stitched up, and do whatever you want after

1      **Q.**   And who did he physically threaten

2  you?

3      **A.**   Mostly it was just verbally abuse.

4      **Q.**   So it was verbal abuse?

5      **A.**   Just verbal abuse.  The F word.

6      **Q.**   Okay.  Did he ever lunge at you, swing

7  at you?

8      **A.**   Negative.

9      **Q.**   If a patient is physically threatening

10  in the sense that they lunge or swing at you,

11  what is the protocol for a paramedic to do?

12      **A.**   Well, in my line of job, we try to

13  anticipate if we're going to have a violent

14  patient or not.  And what we do is either -- if

15  we feel like we're going to be tying this guy

16  up, we'll end up calling reinforcements, either

17  our engine, or we'll call and get it for CPD,

18  and we'll just stand by.

19      **Q.**   Did you call for reinforcement in this

20  instance?

21      **A.**   No.  I think we handled it by

22  ourselves pretty well.

23      **Q.**   Do paramedics have restraints or any

24  type of --

```
 1         A.   Yes, we do.

 2         Q.   And what kind of restraints?

 3         A.   We have soft -- soft or leather

 4    restraints.

 5         Q.   Okay.  And were they used in this

 6    instance?

 7         A.   Negative.

 8         MS. ALIKHAN:  Okay.  I have no further

 9    questions for this witness.

10         HEARING OFFICER JOHNSON:  Any cross?

11         MR. FAHY:  Yes, please.

12                   CROSS-EXAMINATION

13    BY MR. FAHY:

14         Q.   Sir, when you first met the patient,

15    Mr. Miles, you described him being very

16    uncooperative, correct?

17         A.   Yes.

18         Q.   That was with both you and your

19    partner?

20         A.   Yes.

21         Q.   In addition to that, could you tell

22    whether or not he appeared to be intoxicated to

23    you?

24         A.   He admitted to drinking.
```

Q.   Okay.  In addition to admitting that
he had been drinking, based on your
observations could you tell he was under the
influence of some type of substance?

A.   Yes.  The smell.

Q.   Now, in addition to yelling names at
you and being uncooperative, it did take you
several minutes to get him into the ambulance,
correct?

A.   Yes, it did.

Q.   And the reason for that is because he
was uncooperative with you?

A.   Yes, he was.

Q.   And you did testify on direct
examination that at some point you did feel
physically threatened by him?

A.   Well, we do -- we felt -- we feel that
we always go with our sixth sense.  And you
know, we have to make sure that we can back off
or either call for help.  In the beginning we
were like that, you know.  We felt like, you
know, we might have to just call for backup.
And we tamed him, and then we just get him in.
It took a while to get him in.

1   Q. Did you -- did you at one point while

2 you were on the scene call for a police assist

3 because he was so uncooperative?

4   A. Negative.  Usually when it's a

5 stabbing, CPD responds.

6   Q. Pardon me?

7   A. Usually on a stabbing CPD responds.

8 Chicago Police always responds on a stabbing, a

9 gunshot.  I never call for a backup because

10 usually we expect them to be there before us

11 actually.

12   Q. So you -- did you speak with an

13 Investigator Lyons from the Chicago Police

14 Department Office of Professional Standards

15 after this incident?

16   A. I think I did.

17   Q. Okay.

18   A. And again, this is two years ago,

19 so...

20   Q. No, I understand.  And do you remember

21 speaking with her on September 9th, 2005?

22   A. Again, it was two years ago.

23   Q. Do you remember giving a statement to

24 that investigator?

1      **A.**   I gave some type of statement, but I

2    don't remember to who.

3            MR. FAHY:   If I may have a moment.

4                    (Brief Pause)

5            MR. FAHY:   May I approach?

6            HEARING OFFICER JOHNSON:   Yeah.

7    BY MR. FAHY:

8      **Q.**   Sir, I'm showing you what's been

9    marked as Respondent's Exhibit Number 1 for

10   identification.   Do you recognize what that is?

11     **A.**   A statement.

12     **Q.**   A statement by whom?

13     **A.**   According to this, it was given by me.

14     **Q.**   Okay.   And does your signature appear

15   on that statement?

16     **A.**   Yep.

17     **Q.**   And is that the statement that you

18   gave to Investigator Lyons on September 9th,

19   2005 relative to this incident?

20     **A.**   If -- yes.

21     **Q.**   And did you read that statement before

22   you had signed it?

23     **A.**   Yes.

24     **Q.**   I'm just going to ask you, calling

1    your attention to Page 2 of the statement on

2    the top paragraph.  In that statement -- I'm

3    going to ask you if you could read that

4    paragraph, actually.

5        A.  The top one?

6        Q.  Yes.  The top paragraph of Page 2.

7        A.  In the back, with Miles after he was

8    placed inside --

9        Q.  No, I'm sorry.  If you could read it

10   to yourself.

11       A.  Oh, I thought you said read it --

12       Q.  I'm sorry.

13                    (Brief Pause)

14            THE WITNESS:  Okay.

15   BY MR. FAHY:

16       Q.  Does that refresh your memory as to

17   whether or not you called for a police assist

18   while you were on the scene?

19       A.  According to that, it says we did call

20   for police.  But again, the incident was two

21   years ago, so...

22       Q.  Okay.  So as you sit here today, you

23   don't know if you remember calling for an

24   assist?

1     A.    Exactly.

2     Q.    But on September 9th of 2005 you did

3 tell the investigator that you had called for

4 an assist, correct?

5     A.    Yes.   According to that, yes.

6     Q.    And that's because Miles was so

7 uncooperative, correct?

8     A.    Yes.   And belligerent, according to

9 that piece of paper.

10     Q.    And when you say an assist, you

11 specifically said a police assist?

12     A.    Yeah, because there was nobody there.

13     Q.    Now, when you arrived at the hospital,

14 you again had problems with Mr. Miles, correct?

15     A.    Yes, we did.

16     Q.    He refused to get out of the

17 ambulance.

18     A.    Yes, he did.

19     Q.    Again, he was yelling and being

20 uncooperative with you?

21     A.    Yes, he was.

22     Q.    And that's when you were assisted by

23 other security agents at the hospital, correct?

24     A.    Yes.   There was one when we opened the

```
 1    door, she heard the yelling, and she came to
 2    our aid.
 3              MR. FAHY:  I have no further
 4    questions.
 5              HEARING OFFICER JOHNSON:  Any
 6    redirect?
 7              MS. ALIKHAN:  I have no redirect.
 8              HEARING OFFICER JOHNSON:  Okay.  So if
 9    you can unclip your mike.  Thanks for coming.
10    Appreciate it.
11                    (Witness Excused.)
12                    (The witness was duly sworn.)
13                 ERIKA GARDUNO,
14    called as a witness herein, having been first
15    duly sworn, was examined and testified as
16    follows:
17                 DIRECT EXAMINATION
18    BY MS. ALIKHAN:
19      Q.   Please state and spell your name for
20    the record.
21      A.   Erika Garduno, last name
22    G-A-R-D-U-N-O.
23      Q.   Okay.  And Ms. Garduno, are you
24    employed?
```

1    A.    Yes, ma'am.

2    Q.    Where are you employed?

3    A.    Chicago Fire Department, Ambulance 48.

4    Q.    What is your position there?

5    A.    I'm a paramedic.

6    Q.    How long have you been a paramedic?

7    A.    With the City?

8    Q.    Yes.

9    A.    With the City, seven years.

10    Q.    On August 2nd, 2005 were you called

11   out to West North Avenue?

12    A.    Yes, ma'am.

13    Q.    What was the reason?

14    A.    I believe it was a battery.

15    Q.    And what happened when you arrived?

16    A.    On the -- at the corner of the

17   address -- excuse me.  At the corner of the

18   address -- I don't -- I don't remember

19   specifically the address right now, but I know

20   we came out -- off of North Avenue.  There was

21   argument going on on the second floor.

22            The patient finally came out to

23   the doorstep of our ambulance, and he seemed to

24   have been battered.  Some bloodstains

1   throughout his body, like face and I believe

2   chest and arms, just bloodstains.

3           At that point we didn't know where

4   the injury had been occurred.  So it took us a

5   little convincing to let him come into the

6   ambulance or ask him to come into the

7   ambulance.  Finally after we convinced him, we

8   had him in the -- on the bench.

9      Q.  Okay.

10     A.  He was agitated, and that's the reason

11  why it took us that long to convince him.

12     Q.  Well, let's back up a second.  You

13  said we.  Who are you referring to as we?

14     A.  My partner and I.

15     Q.  Who is your partner?

16     A.  George Pedon at that time.

17     Q.  Okay.  And you stated the patient.  Do

18  you know the patient's name?

19     A.  No, to be honest with you.

20     Q.  Can you describe the patient?

21     A.  I just know he was a tall

22  African-American male.

23     Q.  Around what age, do you know,

24  approximation?

38

1    **A.**   Maybe late 40's, early 50's.

2    **Q.**   So you stated that you tried to get

3    him into the ambulance?

4    **A.**   Correct.

5    **Q.**   Okay.  And please describe that.

6    **A.**   Just since he needed a medical

7    assistance from the bloodstains, that indicated

8    to us that he needed some care.  And of course

9    since we were called onto the scene, we made

10   the assumption that he was a patient so we

11   needed to transport.

12        So convincing him by asking him to

13   come to the ambulance so we can transport him

14   to the hospital -- nearest hospital for medical

15   care, he was belligerent, a little agitated,

16   saying -- and the specifics I do not remember.

17   The context of the conversation that he was --

18   or the story that he was saying, like the

19   reason why he was upset.

20        So anyway, he was referring to the

21   person upstairs, I believe, that he had had the

22   argument with.  So he was referring to that,

23   and he was saying no one's going to take me

24   anywhere.  I'm fine.  Just let me go.

1          And finally after we convinced him

2   to come into the ambulance, he somewhat calmed

3   down, but he was still agitated in the back.

4       Q.   By belligerent and agitated, what

5   specifically do you mean by that as far as

6   conduct?

7       A.   Well, agitated only because he didn't

8   want us to take care of him.  And he said at

9   one point:  You white people, you don't treat

10  me.  You let me go.  And belligerent, just

11  using profanity, that type of belligerent.

12          Finally my partner explained to

13  him that we weren't white people, that we were

14  Hispanic, and that we were there to help him

15  out and take care of him.  At that point he

16  calmed down, and we took him to the hospital.

17      Q.   At any point did he physically

18  threaten you?

19      A.   I don't remember, to be honest with

20  you.

21      Q.   Okay.  Do you remember --

22      A.   Wait.  I believe what we were trying

23  to convince him that it was -- we had called

24  for police backup, so police and I -- it still

1    took a while to -- to have police backup.  I

2    don't think we even got police backup at the

3    scene.  What else?

4         Q.   Who called for the police backup?

5         A.   I believe my partner did.

6         Q.   And do you know the reason?

7         A.   Just because he was a little hard to

8    convince to calm down and to care for.

9         Q.   In what instance would you call for

10   police backup?

11        A.   Any time that we are threatened

12   physically --

13        Q.   Okay.

14        A.   -- by any patient.

15        Q.   Were you threatened physically by a

16   patient?

17        A.   I believe, if we had asked for police

18   backup I -- yes.

19        Q.   But you can't remember specifically --

20        A.   No, not specifics, no.

21        Q.   While in the ambulance was the patient

22   restrained in any manner?

23        A.   No.

24        Q.   Why is that?

1      A.   Because we finally had convinced him

2  to calm down.

3      Q.   When you got to the hospital what

4  happened?

5      A.   I went and get a wheelchair to

6  transport the patient from the ambulance to the

7  ER for -- to continue with the medical care.

8      Q.   Okay.  Was there any incident when he

9  was taken out of the ambulance?

10     A.   Yeah.  He stepped out after I -- I

11  arrived to the side of the ambulance or the

12  back of the ambulance with the wheelchair.  He

13  stepped out, he sat in the am -- you know, on

14  the wheelchair, and I transported him to the

15  ER.

16     Q.   Right.  I guess my question is was he

17  cooperative while exiting the ambulance?

18     A.   Was he cooperative in the ambulance?

19  Yes.

20     Q.   While exiting the ambulance?

21     A.   Yes.

22     Q.   He was?

23     A.   Yes.

24     Q.   Okay.  And at that point you had

 1  turned him over to the hospital --

 2      A.   Correct.

 3      Q.   -- for care?

 4      A.   We transferred care to the hospital.

 5          MS. ALIKHAN:  Okay.  I have no further

 6  questions at this point.

 7          HEARING OFFICER JOHNSON:  Cross.

 8                  CROSS-EXAMINATION

 9  BY MR. FAHY:

10      Q.   Ma'am, you testified that -- on your

11  Direct Examination that the reason why you

12  would call for Chicago Police backup is when

13  you're physically threatened by a patient,

14  correct?

15      A.   Correct.

16      Q.   Okay.  A Chicago Police backup was

17  called in this particular instance, correct?

18      A.   I believe so, yes.

19      Q.   Okay.  You just don't remember --

20      A.   I know that they never arrived to the

21  scene.

22      Q.   Okay.

23      A.   I do remember -- I believe we had

24  requested for police backup.

1      **Q.**   Okay.  And that's because of the

2  behavior of Mr. Miles, correct?

3      **A.**   Correct.

4      **Q.**   And in addition to being drunk -- or

5  belligerent, did you also make observations as

6  to whether or not he was intoxicated?

7      **A.**   Yes.

8      **Q.**   Was it pretty obvious to you that he

9  was --

10      **A.**   Yes.

11      **Q.**   -- intoxicated based on your

12  experience?

13      **A.**   Yes.

14      **Q.**   Now, you mentioned at the hospital

15  when you got there, did you leave the ambulance

16  to go get the wheelchair?

17      **A.**   Correct.

18      **Q.**   Okay.  So there was a time that your

19  partner was alone?

20      **A.**   My partner was -- yeah, my partner was

21  always in the back with him.

22      **Q.**   Okay.  So with regards to Mr. Miles'

23  behavior at the hospital, did you see him when

24  he was refusing to get out of the ambulance?

```
 1        A.   Did I -- no.  Getting out of the
 2   ambulance --
 3             MS. ALIKHAN:  Objection.  There's --
 4             THE WITNESS:  No.
 5             MS. ALIKHAN:  -- no facts in evidence
 6   that indicate -- she didn't testify he
 7   refused --
 8             HEARING OFFICER JOHNSON:  Well, I
 9   think that question could be did she observe
10   him as he was being -- coming out of the
11   ambulance, or was she doing something else.
12             MR. FAHY:  I'll recast the question.
13   BY MR. FAHY:
14        Q.   Did you see him being brought out of
15   the ambulance?
16        A.   Well, yeah.  I was the one that
17   transported him from --
18        Q.   How -- from the time that you left the
19   ambulance to go get the wheelchair and come
20   back, how much time passed?
21        A.   Oh, gosh.  Maybe a minute.
22        Q.   Okay.  Did you or your partner ask for
23   assistance at that point?
24        A.   No.
```

45

1    Q.   Do you remember security personnel

2    assisting you and your partner with the patient

3    at that point?

4    A.   Not from the ambulance, no.  We may

5    have requested security assistance -- no.  No,

6    we did not.

7    Q.   Are you saying you did not request

8    security assistance?

9    A.   No, we didn't -- I didn't.

10    Q.   Do you know if security assistance did

11    come to help you and your partner with the

12    patient?

13    A.   I don't recall that.

14    MR. FAHY:  I have no further

15    questions.

16    HEARING OFFICER JOHNSON:  Redirect?

17    MS. ALIKHAN:  No redirect.

18    HEARING OFFICER JOHNSON:  Okay.  So if

19    I can unclip your mike.  All right.  Okay.

20    Thanks for coming.

21                    (Witness Excused.)

22                    (The witness was duly sworn.)

23               VICENTE SEBASTIAN,

24    called as a witness herein, having been first

```
 1    duly sworn, was examined and testified as

 2    follows:

 3                    DIRECT EXAMINATION

 4    BY MS. ALIKHAN:

 5         Q.   Good morning.

 6         A.   Good morning.

 7         Q.   Please state and spell your name for

 8    the record.

 9         A.   My name is Vicente, V-I-C-E-N-T-E,

10    Sebastian, S-E-B-A-S-T-I-A-N.

11         Q.   Okay.  Mr. Sebastian, are you

12    employed?

13         A.   Yes.

14         Q.   Where are you employed?

15         A.   I'm employed at Norwegian American

16    Hospital.

17         Q.   What is your position at Norwegian

18    American Hospital?

19         A.   I'm a security officer.

20         Q.   How long have you been a security

21    officer?

22         A.   About 32 years.

23         Q.   Okay.  Do you recall an incident on

24    August 2nd, 2005 regarding a police officer and
```

1    a patient at Norwegian American Hospital?

2        A.    Yes.

3        Q.    And where did that incident take

4    place?

5        A.    It took place inside the ER lobby

6    area.

7        Q.    Were you working that day?

8        A.    Yes.

9        Q.    And where were you when the incident

10   took place?

11       A.    I was behind the patient wheelchair.

12       Q.    So please describe for the Court what

13   happened.

14       A.    It started when the paramedics, the

15   ambulance asked me for assistance to bring the

16   patient out of the ambulance and to put him in

17   the wheelchair and take him inside the ER

18   triage.  So I was able to convince the patient

19   to come out of the ambulance and go to the

20   wheelchair, and I took him inside the triage.

21            And then the nurse in triage tried

22   to triage the patient, but he was very

23   uncooperative.  And so the nurse took him out

24   of the triage and said when you're ready, when

1    you're calmed down, and I will -- I'll talk to

2    you again.

3         Q.   Okay.  Let me stop you there for a

4    second.  You said the patient was uncooperative

5    with the triage nurse.  Can you describe that

6    in more detail?

7         A.   Okay.  The triage, usually when they

8    take a patient inside the hospital, they have

9    to be triaged by the nurse, and they evaluate,

10   you know, the condition of the patient.  But he

11   was highly intoxicated and verbally abusive

12   subject in the wheelchair.

13        Q.   How do you know that the subject in

14   the wheelchair was intoxicated?

15        A.   That's what I was told by the

16   paramedics when I came out to get him out of

17   the ambulance.

18        Q.   So you were told by the paramedics?

19        A.   Right.

20        Q.   And you said he was verbally abusive,

21   and what does that mean in specific?

22        A.   Well, cursing, you know, using the F

23   language, you know.

24        Q.   Okay.  So go on.

1          A.    And so when he wasn't able to

2    cooperate with the nurse in triage, we brought

3    him outside the ER lobby area, you know,

4    outside the door.  And then Police Officer

5    Cozzi came in and tried to question him, and he

6    got loud and abusive with the police officer,

7    you know.  And then he applied handcuff on him

8    on the front position.

9          Q.    Okay.  So you said that the patient

10   that you took from the ambulance became loud

11   and abusive with the police officer.  And

12   abusive, what do you mean?

13         A.    Same thing as, you know, cursing him

14   loud, being loud.

15         Q.    So cursing and being loud.

16         A.    Yeah.

17         Q.    And you said at that point the officer

18   applied handcuffs?

19         A.    Yeah.  In the front position.

20         Q.    Okay.  Do you see that officer here

21   today?

22         A.    Yes.

23         Q.    And can you point him out and describe

24   a piece of clothing that he's wearing?

```
 1          A.   He's wearing a suit with like cream --
 2               HEARING OFFICER JOHNSON:  Yeah.  We'll
 3   recognize the identification of Officer Cozzi.
 4   He doesn't deny that he was there.
 5   BY MS. ALIKHAN:
 6          Q.   Okay.  So after he applied the
 7   handcuffs, please go on.
 8          A.   Okay.  And then he left to get
 9   something from -- I don't know.  He left the
10   emergency room.  So I gather to get something
11   from his car.
12          Q.   So did he physically walk outside or
13   he just left the emergency room?
14               HEARING OFFICER JOHNSON:  This is
15   Officer Cozzi we're talking about?
16               THE WITNESS:  Yes.
17               HEARING OFFICER JOHNSON:  All right.
18               THE WITNESS:  And he left and he walk
19   out through the emergency room.  When he came
20   back, he had leg -- leg iron, you know, leg
21   shackles.  And he applied the shackles on
22   the -- on the main subject.
23   BY MS. ALIKHAN:
24          Q.   So at that point the patient was
```

1    handcuffed, and then he was put leg shackles

2    on?

3         A.   Uh-huh.

4         Q.   What were the leg shackles attached

5    to?

6         A.   It was just both legs chained.

7         Q.   Was the patient standing up or...

8         A.   No.  He's still sitting down in the

9    wheelchair.

10         Q.   He was in the wheelchair.  What

11    happened after the shackles were applied?

12         A.   There was some verbal discussion

13    between them, and Officer Cozzi took out a

14    blackjack and hit him, I think, a couple in the

15    chest, you know, about several times.  And then

16    on the -- on the face and then somewhere in the

17    chest.  I would say maybe about eight or maybe

18    nine or ten counts.

19         Q.   Okay.  Do you know what a blackjack

20    is?

21         A.   Yeah.  It's a like simple -- like

22    simple thing about -- maybe about this long.

23         Q.   Okay.  And what does it look like?

24         A.   It's shaped like a -- like a maybe

1  a -- I would describe it like a wooden spoon

2  that was wrapped in a -- in a leather.

3      Q.  You saw Officer Cozzi with that

4  object?

5      A.  Yeah.

6      Q.  Do you know where that object came

7  from?

8      A.  From his waist.  Took it out of his

9  waist.

10      Q.  You stated that he hit the patient in

11  the chest a couple of times?

12      A.  A total of maybe -- I don't know.

13  Maybe, you know, including the facial -- the

14  face, maybe about nine or ten.

15      Q.  So was it only in the chest and the

16  face that Officer Cozzi hit the patient?

17      A.  Yeah.  That's what I recall.

18      Q.  And what happened with the patient

19  after that?

20      A.  We were told that there was a room

21  available to -- you know, to put him -- to put

22  the patient inside.  So we -- I wheel him

23  inside, inside the ER entrance door to the

24  treatment area.  And I think he hit him one

1    more time with the door.

2        Q.   Now, while you were -- while you were

3    caring for the patient or transporting the

4    patient from the ambulance to the ER, did the

5    patient ever try to physically abuse you?

6        A.   No.  But it's verbal -- it's verbally

7    abusive, but you know, we all get that in the

8    hospital, so you just ignore it.

9        Q.   Did you ever witness the patient try

10   to physically abuse the police officer?

11       A.   I think he tried to lunge at the --

12   lunge at him.

13       Q.   Okay.  And when did that happen?

14       A.   When we were -- when the nurse in

15   triage said he's not cooperating, you know.

16   Bring him outside the door.  And when he was

17   questioning him or something, he tried to lunge

18   -- lunge at him, and I grab him back.

19       Q.   Did he try to -- did you see him swing

20   his arm?

21       A.   Well, he was already handcuffed.

22       Q.   He was already handcuffed.  Did...

23            Were the shackles already placed

24   on him?

54

1      A.   No.   I think handcuff came first, and

2    then he went out and got the shackles.

3           MS. ALIKHAN:   Okay.   No further

4    questions at this time.

5           HEARING OFFICER JOHNSON:   Any cross of

6    this witness?

7           MR. FAHY:   I do.   Thank you.

8                   CROSS-EXAMINATION

9    BY MR. FAHY:

10     Q.   Mr. Sebastian, the paramedics had

11   asked you for assistance with this particular

12   patient, correct?

13     A.   Yes.

14     Q.   So you went out and assisted the

15   Chicago Fire Department ambulance personnel --

16     A.   Right.

17     Q.   -- with this particular patient,

18   right?

19           When you first saw this patient,

20   was the patient being argumentative?

21     A.   Correct.

22     Q.   Was he being uncooperative with you

23   and the -- and the ambulance personnel?

24     A.   Yes.

1      Q.   You testified that he appeared to you

2   to be intoxicated, correct?

3      A.   That's what the paramedics told me.

4      Q.   Okay.  Based on your observations, did

5   you believe him to be in an intoxicated state?

6      A.   Yes.

7      Q.   Now, when he was brought into the --

8   into the hospital, he continued to be

9   uncooperative and loud towards the personnel

10  there?

11     A.   Yes.

12     Q.   The triage nurse refused to treat him?

13     A.   Yeah.  He just cursing and -- all

14  over.

15     Q.   Okay.  And it was shortly after that

16  that Officer Cozzi actually arrived on the

17  scene, correct?

18     A.   Correct.

19     Q.   Now, when Officer Cozzi first arrived,

20  he tried to question Mr. Miles?

21     A.   Yes.

22     Q.   And it was at that time that Mr. Miles

23  became very combative?

24     A.   Uh-huh.

1    Q.    And he also was verbally abusive

2    towards Officer Cozzi?

3    A.    Correct.

4    Q.    And would not cooperate with him,

5    correct?

6    A.    Yeah.

7    Q.    Now, when you say that he was verbally

8    abusive at that point, what do you mean?

9    A.    Cussing you out, you know, the F word

10   and -- you know.

11   Q.    And that was all prior to him being

12   handcuffed, correct?

13   A.    Yeah.  When he did that, he applied

14   the handcuffs.  So I thought he was under

15   arrest already, you know.

16           So usually when the subject in the

17   hospital is placed under arrest, you know, we

18   try to back off because that's their prisoner.

19   Q.    Okay.  But you also described him and

20   Officer Cozzi first tried to question him as

21   being very combative also, correct?

22   A.    The first time they met?

23   Q.    Yes.

24   A.    Yes, sir.

Q.  And what do you mean by that?

A.  Well, he tried to question him, and then he just, you know -- you know, yelling and screaming and cursing at Officer Cozzi.

Q.  And at one point he actually lunged at Officer Cozzi, correct?

A.  Yeah.

Q.  Okay.  After he lunged at Officer Cozzi, is that when Officer Cozzi placed him under arrest?

A.  I don't know if it was originally -- I don't know if it was originally being placed under arrest before their confrontation, you know.  So after he lunged, he put a handcuff on him.

Q.  Okay.  So after the patient lunged, that's when Officer Cozzi handcuffed him?

A.  Right.

Q.  Okay.  And after he handcuffed him, that's when he went out and got the leg cuffs?

A.  Right.  See, I really don't know where he went.  I know he went outside.

Q.  Okay.  And then returned with the leg cuffs?

1    A.   Right,

2    Q.   And after he returned with the leg

3  cuffs, is it true that Mr. Miles at that point

4  became even more enraged as a result of that?

5    A.   Right.

6    Q.   Now, did you hear Officer Cozzi tell

7  him that he was being placed under arrest for

8  resisting arrest?

9    A.   Not really.  It was -- you know,

10  not -- I don't recall.  I --

11    Q.   You don't recall that?  Okay.

12    A.   No.

13    Q.   Now, Officer Cozzi also talked to you

14  about criminal charges against Mr. Miles,

15  correct?

16    A.   I don't recall it either.

17    Q.   Well --

18    A.   But see, when I -- when he applied the

19  handcuff, I presumed he was under arrest.

20    Q.   Okay.

21    A.   Uh-huh.

22    Q.   But he also asked you if you wanted

23  him charged for assaulting you?

24    A.   Yes.

59

1      **Q.**   Okay.  And did you agree that you

2  wanted him charged for assaulting you?

3      **A.**   Since -- since he's already under

4  arrest under police custody, I said no because

5  there's no reason for it.

6      **Q.**   Are you telling me that you did -- you

7  told Officer Cozzi that you did not want him

8  charged with assaulting you?

9      **A.**   I think so.  That's what I said.

10     **Q.**   Sir, did you sign criminal complaints

11 for the charge of assault against you?

12     **A.**   I don't remember really.  It's been

13 quite sometime.

14     **Q.**   So you may have signed criminal

15 complaints?

16     **A.**   I may have signed.  I may have.

17     **Q.**   Do you remember Officer Cozzi

18 presenting you with criminal complaints for the

19 charge of assault?

20     **A.**   I think he asked me that -- if I want

21 to sign a complaint, but I don't remember if I

22 signed the complaint.  I'm not so sure.  It's

23 been quite sometime.

24     **Q.**   So what you're telling us is you're

1    not sure if you had him charged with the

2    offense of assault for his actions against you?

3         A.   Towards me?

4         Q.   Yes.

5         A.   No.

6         Q.   You don't remember?

7         A.   I don't really remember.

8         Q.   Well, isn't it true that you asked

9    Officer Cozzi to have him charged with regards

10   to the assault charge because of the threats he

11   had made against you?

12        A.   No.  He's the one who suggested to me

13   if I want to sign a complaint against him for

14   his actions.

15        Q.   Okay.

16        A.   I don't remember that I asked him to.

17        Q.   Okay.  Well, let me just try it again.

18             Did you then sign those complaints

19   charging him --

20        A.   As I said, I don't remember it though,

21   you know.

22        Q.   You described Officer Cozzi as

23   using -- I think you described it as a

24   blackjack, correct?

1      A.   Uh-huh.

2      Q.   How large was it?

3      A.   Probably -- I don't know.  Maybe six

4   or seven inches.

5      Q.   Six or seven inches.  And are you

6   familiar with blackjacks?

7      A.   I seen one.

8      Q.   When you saw Officer Cozzi strike the

9   blows, where were you?

10      A.   I was behind the wheelchair with the

11   patient.

12      Q.   You were holding the back of the

13   wheelchair?

14      A.   Right.

15      Q.   Did you react at all when you saw

16   Officer Cozzi make striking motions and --

17      A.   Actually I was -- as I said, being a

18   security guard for so long, I don't involve

19   myself with police matters, you know.  See, I

20   did that one time and --

21           Because, see, it might -- it

22   might -- we might end up hurting the -- the

23   person under police custody if he did attack us

24   or provoke something that would attack us.  So

1    usually when that thing happen, when he apply

2    the handcuff, I just like back it off.

3         Q.   But you were there?

4         A.   I was there.

5         Q.   Do you remember Officer Cozzi, you

6    know, telling the patient not to be acting up

7    in front of the hospital personnel?

8         A.   Yeah.

9         Q.   And was he warning him not to do that

10   when he was brought into the emergency room?

11        A.   Yeah.

12        Q.   And was he warning him not to do that

13   while he administered some of these strikes?

14        A.   What happened, sir, again?

15        Q.   Was he telling the patient not to be

16   acting up when he was brought into the

17   emergency room as he's administering some of

18   that -- some of the blows or the strikes?

19        A.   No.  But there is a word that he

20   mentioned.  I don't work here.  I don't care.

21   You know.

22        Q.   Now, the patient wasn't injured as a

23   result of any of this contact that he had with

24   Officer Cozzi, was he?

1    A.   I don't really visibly know if he had

2  any injury.

3    Q.   Okay.  Well, after this he was brought

4  right into the emergency room, correct?

5    A.   Uh-huh.

6    Q.   And he was treated by doctors there?

7    A.   Right.  He had --

8    Q.   Did you remain there?

9    A.   Oh, no.  Once he is placed inside the

10  ER bed treatment, you know, we give the rest to

11  the staff to do what they have to do.

12    Q.   Okay.  So you did not observe any

13  injuries other than what you --

14    A.   I didn't notice -- I didn't notice any

15  injuries.

16    Q.   Okay.  Other than the

17  one laceration --

18    A.   Right.

19    Q.   -- that he had on his arm?

20        MR. FAHY:  I have no further

21  questions.

22              REDIRECT EXAMINATION

23  BY MS. ALIKHAN:

24    Q.   Mr. Sebastian, you said that the

1    patient was handcuffed after he lunged at the

2    police officer; is that correct?

3        A.    Yeah.

4        Q.    Okay.  And then at some point he was

5    handcuffed, and then a little bit later on he

6    was put -- shackles were put on him?

7        A.    He was handcuffed.  After he was

8    handcuffed, Officer Cozzi left and went outside

9    the hospital, you know.  So I don't know what

10   he did, but then he came back with the shackle.

11       Q.    Okay.  And at that point the shackles

12   were placed on him, correct?

13       A.    Right.

14       Q.    And then it was after that --

15       A.    Shackle, he pulled the blackjack and

16   hit him.

17       Q.    Okay.  So after initially that one

18   lunge, did Mr. -- did the patient pose any

19   threat to the police officer by swinging his

20   fist --

21       A.    He finally calmed down after -- after

22   Officer Cozzi hit him.

23       Q.    So he calmed down while --

24       A.    After, you know.  When he applied the

1    handcuff, he was still mouthing off, and he

2    tried to lunge at Officer Cozzi.  So I pulled

3    him back, and then Officer Cozzi hit him and --

4    you know, with the blackjack.  And then that

5    it.  He calmed -- he didn't react no more.

6         Q.   So it -- okay.  I just want to get

7    this clear.  When exactly did Officer Cozzi hit

8    the patient, at what point?

9         A.   When he came back with the shackle.

10        Q.   So was this before the shackles were

11   placed or after?

12        A.   After it was placed.

13        Q.   So after the shackles were placed on

14   is when Officer Cozzi hit the patient?

15        A.   Right.

16        Q.   Okay.  And that's also after the

17   patient had already lunged at Officer Cozzi,

18   correct?

19        A.   Yeah.  After he handcuffed him, he

20   tried to lunge at Officer Cozzi.

21        Q.   All right.  So you stated earlier that

22   offic -- that the patient never tried to

23   physically threaten you; is that correct?

24        A.   Well, he is mouth -- not physically

1    threatening me.  He was just mouthing off,

2    cursing me.

3              VIDEOGRAPHER:  One moment, please.

4                   (Brief Pause)

5              HEARING OFFICER JOHNSON:  Okay.  You

6    want to proceed?

7    BY MS. ALIKHAN:

8        Q.   Now Mr. Sebastian, you also stated

9    that when Officer Cozzi asked if you wanted to

10   proceed with charges of assault against the

11   patient you said no, correct?

12       A.   Yeah.  I think so.

13       Q.   Okay.  And you -- also on

14   Cross-Examination you stated that Officer Cozzi

15   was saying something when he was hitting the

16   patient?

17       A.   Right.

18       Q.   And what was he saying?

19       A.   He said I don't care.  I don't work

20   here.

21       Q.   And when you wheeled -- was it you

22   that wheeled the patient into the ER room?

23       A.   Yes.

24       Q.   How long did -- and how long did you

1    stay after you had wheeled him into the ER

2    room?

3        A.    Once we got him in the bed that he was

4    assigned, you know, which is Bed 7, we put him

5    in the bed and removed the shackle and applied

6    the restraint on the patient.

7        Q.    How long would you say that took?

8        A.    Probably about maybe around five

9    minutes.

10       Q.    Five minutes.  And then you left?

11       A.    Then I left.

12       Q.    Did you see the patient at any point

13   after that?

14       A.    No.

15           MS. ALIKHAN:    Okay.  I have no further

16   questions.

17           HEARING OFFICER JOHNSON:    Any recross?

18           MR. FAHY:    No, your Honor.

19           HEARING OFFICER JOHNSON:    Okay.  If

20   you want to unhook your microphone, okay?

21   Thank you for coming.

22                (Witness Excused.)

23           HEARING OFFICER JOHNSON:    You want to

24   take a seat right up here on this chair.

```
 1                      (The interpreter was duly

 2                       sworn)

 3                      (The witness was duly sworn.)

 4                    EVELYN ESTRADA,

 5    called as a witness herein, having been first

 6    duly sworn, was examined and testified as

 7    follows:

 8                  DIRECT EXAMINATION

 9    BY MS. ALIKHAN:

10        Q.   Please state and spell your name for

11    the record.

12        A.   Evelyn Estrada, E-S-T-R-A-D-A,

13    E-V-E-L-Y-N.

14        Q.   Ms. Estrada, are you employed?

15        A.   Yes.

16        Q.   Where are you employed?

17        A.   At the hospital, Norwegian American

18    Hospital.

19        Q.   How long have you worked there?

20        A.   Approximately seven years.

21        Q.   What's your position there?

22        A.   Security.

23        Q.   On August 2nd, 2005 did you witness an

24    incident between a police officer and a
```

1    patient?

2         A.   Yes.

3         Q.   And where -- were you working that

4    day?

5         A.   Yes.

6         Q.   Where did that incident take place?

7         A.   At the emergency room, emergency -- at

8    the lobby of the emergency room.

9         Q.   And where are you in relation to where

10   the incident took place?

11        A.   I was at the emergency lobby.

12        Q.   Approximately how many feet were you

13   away from the incident?

14        A.   First I was outside the emergency,

15   outside the lobby, and a paramedic called me

16   saying that he needed help because of a patient

17   that was inside the ambulance who did not want

18   to come out of the ambulance.

19             We took him inside the vestibule

20   in the chair of the lobby.  And then after that

21   we took him inside...

22             THE WITNESS:  Triage.

23   BY THE INTERPRETER:

24        A.   Triage.  I don't know how to say that

1    in Spanish.

2        Q.   Let's back up a second.  You said that

3    you were first outside helping the paramedics

4    with an uncooperative patient?

5        A.   Okay.  When this all occurred, it was

6    inside the emergency, not at the vestibule.

7        Q.   Right.  But I want to take you back to

8    when you were outside.

9        A.   Okay.  Me and Sebastian, my co-worker,

10   I helped him with the patient.  And then we put

11   him inside the triage.

12       Q.   Okay.  You stated earlier that the

13   patient -- you needed to help with an

14   uncooperative patient.  In what way was that

15   person being uncooperative?

16       A.   He didn't want to come out of the

17   ambulance, and also he was cussing, saying bad

18   words.  And then we took him inside the triage

19   along with the nurse.  And then he started also

20   speaking badly to the nurse.  And he was

21   threatening her.  It was then that the nurse

22   said that she wasn't going to take care of him

23   until he will calm down.

24       Q.   How was he threatening her?

1          **A.**   Well, he was saying that he was going

2   to hit her, and he got up once, but due to the

3   fact that he was intoxicated, he wanted to hit

4   the nurse.

5          **Q.**   Did he hit the nurse?

6          **A.**   No.

7          **Q.**   Did you see him swing his arms to hit

8   the nurse?

9          **A.**   Well, due to his intoxication, he

10   wasn't able to.  He was just trying to.

11          **Q.**   How do you know he was trying to?

12          **A.**   Because I was watching him.

13          **Q.**   Okay.  Did you see his arms swing?

14          **A.**   He went like this.

15                    (Demonstrating)

16  BY MS. ALIKHAN:

17          **Q.**   So he grabbed towards her?

18          **A.**   He tried.

19          **Q.**   Okay.  So after the nurse said that

20   she didn't want to treat him anymore, what

21   happened?

22          **A.**   Then we got him out of the triage.

23   Then once we were outside the triage at the

24   lobby, the officer put the handcuffs on him.

1      Q.    When did you first see the officer?

2      A.    Once the paramedic came in with us, he

3  was already behind us.

4      Q.    Okay.  So what happened at that point?

5      A.    Well, then the patient was already

6  inside the triage.

7      Q.    And what happened inside the triage?

8      A.    We were just staying there hoping that

9  nothing would happen about the nurse.

10      Q.    Okay.  Where was the patient at that

11  point?

12      A.    He was sitting on a wheelchair.

13      Q.    And were his hands and legs free?

14      A.    Yes.

15      Q.    Did the officer ever approach the

16  patient?

17      A.    Not inside the triage, but he did at

18  the door.

19      Q.    Okay.  So when was the patient taken

20  out of triage?

21      A.    Once the nurse said that she wasn't

22  going to do the triage to him because of the

23  way he was and that he had to calm down first.

24      Q.    So were you inside the triage as well?

1    A.    No.   I was at the door.

2    Q.    How did the patient get from inside

3    the triage to outside of the triage?

4    A.    When we went to the other part, and

5    then my co-worker got him out of the triage.

6    Q.    Was he still in the wheelchair at this

7    point?

8    A.    Yes.

9    Q.    When the officer approached the

10   patient, what happened?

11   A.    Okay.  Once the officer noticed that

12   he was talking badly, then he told the man that

13   he was under arrest and he handcuff him.

14   Q.    So the patient was talking badly to

15   the officer, and that's when the officer placed

16   him under arrest?

17   A.    Yes.   The patient was talking like

18   that, ugly to everyone who was there.

19   Q.    And by ugly, what do you mean?

20   A.    Cursing.

21   Q.    Was it just cursing?

22   A.    And threatening.

23   Q.    And what did he threaten?

24   A.    That he was going to kill everyone.

1     Q.  Okay.  You say that he said he was

2  going to kill everyone.  Did he ever threaten

3  to kill you?

4     A.  No.  He wasn't referring to no one in

5  particular.

6     Q.  Okay.  Did the patient ever try to

7  physically hurt you?

8     A.  No.

9     Q.  Did you see the patient ever try to

10  physically hurt the police officer?

11     A.  Only by words.

12     Q.  Okay.  So at what point were the --

13  when the officer said put on the handcuffs,

14  what point was that?

15     A.  Once my co-worker got the wheelchair

16  outside, outside the triage, in the lobby.

17     Q.  So at that point, that's when the

18  officer placed the handcuffs on the patient?

19     A.  Yes.

20     Q.  What happened after the handcuffs were

21  placed on the patient?

22     A.  Then the doctor was going by, and he

23  start giving orders pertaining to the patient.

24  And then at that moment the officer went

1    outside, outside the building.  And then he

2    came back a few minutes later with some

3    shackles, and he placed them on his feet.

4         Q.   What was the patient doing at that

5    point?

6         A.   Nothing.

7         Q.   Was he yelling?

8         A.   No.

9         Q.   So after the shackles were placed onto

10   the patient's feet, what did you observe after

11   that?

12        A.   That the officer took out an object, a

13   round object, small, it looked like it was

14   leather, and with it he hit him at the face and

15   the chest.

16        Q.   Did he hit the patient anywhere else

17   with that?

18        A.   At the stomach.

19        Q.   Do you know about how many times the

20   police officer hit the patient?

21        A.   Approximately ten times.

22        Q.   Did you ever see -- prior to the

23   patient being handcuffed or shackled, did you

24   ever see the patient lunge at the police

1   officer?

2       A.   No.

3       Q.   And when all this was happening, where

4   were you in relation to the incident?

5       A.   Where was I?

6       Q.   Yes.

7       A.   To the side of my co-worker, behind

8   the wheelchair.

9       Q.   Do you -- when the police officer was

10  hitting the patient, do you recall if he was

11  saying anything while he was hitting him?

12      A.   He wasn't saying anything.

13      Q.   The police officer wasn't saying

14  anything?

15      A.   The policeman said something.

16      Q.   What did he say?

17      A.   He said -- I don't know how to say it

18  in Spanish.

19      Q.   Do you know how to say it in English?

20      A.   Can I say that in here in court?

21           HEARING OFFICER JOHNSON:  Yes.

22  BY THE WITNESS:

23      A.   I don't give a shit.  I don't work

24  here.  I don't give a shit.  I don't work here.

1    I'm not security.

2            BY THE INTERPRETER:  He said I don't

3    give a shit.  I don't work here.  I'm a police

4    officer.

5            THE WITNESS:  I'm not security.

6            BY THE INTERPRETER:  I'm not security.

7    BY MS. ALIKHAN:

8        Q.  And what happened after that?

9        A.  While, he was -- when he said that, he

10   was hitting him, and then we were carrying him

11   into the emergency.  And then once, as we were

12   getting through the door, he went ahead again

13   and hit him again.

14       Q.  So when you were getting through the

15   emergency room doors, the officer hit the

16   patient again?

17       A.  That is when he was following and

18   hitting him, yes.

19       Q.  And where did he hit him that last

20   time?

21       A.  In the chest.

22       Q.  Did you observe the patient bleeding

23   or any -- from anywhere other than his initial

24   wound?

1      A.    From the mouth.

2      Q.    Did you observe any other wounds?

3      A.    Are you asking me besides the one that

4  he had already -- he already had when he came

5  in?

6      Q.    Yes.

7      A.    No.

8      Q.    When he came in, did you observe him

9  bleeding from the --  when he initially came

10  in, did you observe him bleeding from the

11  mouth?

12      A.    No.

13      Q.    What wounds did you observe him to

14  have when he initially came in?

15      A.    I only noticed a cut in one of his

16  arms, but I don't know which one.

17      Q.    Okay.  Did you ever tell Officer Cozzi

18  that you wanted to file a complaint against the

19  patient for assault?

20      A.    I don't remember that.

21      Q.    Did you ever sign a complaint or a

22  police report indicating that you wanted to

23  press charges against the patient?

24      A.    Vaguely I remember, yes.

1    Q.    Do you remember what that piece of

2    paper was?

3    A.    No.

4    Q.    You stated earlier that -- just to

5    clarify, you stated earlier that the patient

6    never tried to physically hurt you; is that

7    correct?

8    A.    Yes.

9    MS. ALIKHAN:  I have no further

10   questions for this witness.

11   HEARING OFFICER JOHNSON:  Okay.

12   Cross-Examination.

13                    CROSS-EXAMINATION

14   BY MR. FAHY:

15   Q.    Ma'am, you testified that you observed

16   the patient to have bleeding from his mouth?

17   A.    Yes.

18   Q.    Are you saying that's a result of any

19   strikes that Officer Cozzi administered?

20   A.    Yes.

21   Q.    You prepared a report with regards to

22   this incident, didn't you?

23   A.    Yes.

24   Q.    And you prepared a report on the same

1   day of August 2nd, 2005, correct?

2       A.   Yes.

3       Q.   The only mention that you made with

4   regards to the contact between Mr. Miles and

5   Officer Cozzi was that Mr. Miles became

6   verbally abusive and hostile towards Officer

7   Cozzi, and he had to physically subdue

8   Mr. Miles and put him in Room Number 7.  Isn't

9   that the only indication -- or the only thing

10  that you report in your report relative to this

11  incident?

12          THE INTERPRETER:  Counsel, if you

13  don't mind, I need to have that broken down.

14          MR. FAHY:  I'll try it again.

15  BY MR. FAHY:

16      Q.   Isn't it true, ma'am, that you never

17  mentioned in your report that Officer Cozzi

18  caused any bleeding to the patient's mouth?

19      A.   No.  I didn't mention that.

20      Q.   Okay.  Well, you prepared another

21  report a week later, correct?

22      A.   Possibly.  I don't remember though.

23      Q.   Well, I show you what I'll mark as

24  Respondent's Exhibit Number 2 for

1    identification.  And I'll show counsel.

2            THE INTERPRETER:  2 did you say,

3    counsel?

4            MR. FAHY:  Number 2.

5    BY MR. FAHY:

6        Q.    Do you recognize that document?

7        A.    Yes.

8        Q.    And is that the report you made on

9    August 2nd, 2005 with regards to this incident?

10       A.    Possibly.

11       Q.    What do you mean by possibly?

12       A.    Because it happened two years ago, I

13   almost don't remember.  I remember the other

14   one, handwrite it.

15       Q.    Okay.  What do you recognize Exhibit

16   Number 2 to be?

17       A.    That is my report.

18       Q.    Okay.  And that's your report that was

19   made on August 2nd, 2005 after that incident,

20   correct?

21       A.    Yes.

22       Q.    Nowhere in that report do you indicate

23   that Officer Cozzi caused the patient's mouth

24   to bleed, do you?

1      A.   Excuse me?

2      Q.   Is that indicated anywhere on that

3  report?

4      A.   No.

5      Q.   In fact, the only thing indicated in

6  this report is that Mr. Miles became verbally

7  abusive and hostile towards Officer Cozzi, and

8  he had to physically subdue Mr. Miles and put

9  him in Room Number 7?

10     A.   Yes.

11     Q.   Now, you prepared another report a

12  week later, correct?

13     A.   Yes.

14     Q.   And that was on August 9, 2005?

15     A.   Yes.

16     Q.   And you wrote that out?

17     A.   Yes.

18     Q.   You wrote it out in English?

19     A.   Yes.

20     Q.   In your report of August 9th, 2005 do

21  you ever indicate anywhere in that report that

22  Officer Cozzi caused an injury to the patient's

23  mouth?

24     A.   No.

1      Q.   When Officer Cozzi first encountered

2   Mr. Miles, isn't it true that he was trying to

3   calm him down?

4      A.   Yes.

5      Q.   Isn't it true that Mr. Miles would not

6   listen to the police officer?

7      A.   Yes.

8      Q.   The patient was abusive towards

9   Officer Cozzi?

10     A.   It was mostly against the nurse.

11     Q.   Okay.  With regards to Officer Cozzi,

12   was he also verbally abusive to Officer Cozzi?

13     A.   Possibly.

14     Q.   Okay.  Well, let me ask you.  Before

15   the patient was handcuffed, did you see the

16   patient lunge at Officer Cozzi?

17     A.   No.

18     Q.   Did you see him try to get up out of

19   the wheelchair and go after Officer Cozzi?

20     A.   No.

21     Q.   Did you see your partner, Security

22   Officer Sebastian helping Officer Cozzi

23   restrain the patient?

24     A.   Yes.  As I said at the beginning, as

1  the officer was trying to handcuff the patient,

2  I was in the rear, right next to my co-worker.

3  And I wasn't looking at when the officer was

4  trying to restrain the patient.

5      Q.   Okay.  So are you saying you didn't

6  see that?

7      A.   I saw as he was placing the handcuffs

8  to the patient, but I didn't notice my

9  co-worker helping the officer.

10     Q.   Did you see the patient struggling

11  with Officer Cozzi as Officer Cozzi was

12  attempting to cuff him?

13     A.   Yes.

14     Q.   After Officer Cozzi had the patient

15  handcuffed, did that patient continue to scream

16  and be verbally abusive to the officer?

17     A.   Against everyone that was there in

18  that room.

19     Q.   Including the police officer?

20     A.   Yes.

21     Q.   He was threatening to kill people

22  there?

23     A.   Yes.

24     Q.   I may have missed this answer on your

1    Direct Examination, but did you sign a criminal

2    complaint for assault against this patient?

3         A.   Possibly, but I don't remember.

4         Q.   Do you remember speaking to Officer

5    Cozzi with regards to a criminal charge of

6    assault against this particular patient?

7         A.   Possibly.  I don't remember.

8         Q.   Okay.  And do you remember telling

9    Officer Cozzi that this individual had

10   threatened you?

11        A.   No.

12        Q.   After this incident, the patient was

13   brought to the emergency room, correct?

14        A.   Inside.

15        Q.   I'm sorry?

16        A.   We put him inside the emergency room,

17   yes.

18        Q.   After he's brought inside the

19   emergency room, was he seen by a doctor?

20        A.   When he was in that room, yes.

21        Q.   Did you stay with the patient while he

22   was treated?

23        A.   No.

24             MR. FAHY:  I have nothing further.

1                    MS. ALIKHAN:  Just a brief redirect.

2                    REDIRECT EXAMINATION

3    BY MS. ALIKHAN:

4         Q.   You spoke to an investigator from the

5    Office of Professional Standards, right?

6         A.   Possibly.  A few people came to the

7    hospital.

8         Q.   Her name was Grace Wilson?

9         A.   I'm sorry.  I don't remember names.

10        Q.   Okay.  Did you speak anyone -- speak

11   with anyone from the City of Chicago regarding

12   this incident?

13        A.   Yes.

14        Q.   And did you give her -- did you tell

15   her what happened, gave her the details in

16   regards to this incident?

17        A.   Yes.

18                   MS. ALIKHAN:  I have in my hand what

19   I'm marking as Superintendent's Exhibit 2.

20   Showing opposing counsel.

21   BY MS. ALIKHAN:

22        Q.   Now, Ms. Estrada, is that the

23   statement you gave to the investigator from the

24   City of Chicago?

1      **A.**   Yes.

2      **Q.**   In that statement did you tell the

3  investigator that you noticed the patient

4  bleeding after he was struck by --

5          MR. FAHY:  Objection.  Foundation,

6  hearsay.

7          HEARING OFFICER JOHNSON:  Yeah.

8  The -- well, I assume the question's going to

9  be did she mention that -- this injury to the

10  mouth, right?

11         MS. ALIKHAN:  That is correct.

12         HEARING OFFICER JOHNSON:  Okay.  Her

13  testimony -- well, actually, I mean, you

14  brought it on cross it wasn't in her reports.

15  This is rehabilitation of that.  So I'm going

16  to overrule the objection and let that question

17  be asked only.

18  BY MS. ALIKHAN:

19      **Q.**   In that report did you inform the

20  investigator that you saw the patient bleeding

21  from the mouth after he was struck by Officer

22  Cozzi?

23      **A.**   I said that.  I don't know if I said

24  it here though.

```
 1              MS. ALIKHAN:  You can take your time.
 2              HEARING OFFICER JOHNSON:  Well, you're
 3    asking about the injury to the mouth, right?
 4              MS. ALIKHAN:  Right.
 5              THE WITNESS:  Yes.
 6              HEARING OFFICER JOHNSON:  We do
 7    actually need some foundation on this though.
 8    Did she say that this is her statement?
 9              MS. ALIKHAN:  Yes, she did.
10              HEARING OFFICER JOHNSON:  Okay.  All
11    right then.  And you got a date out?
12              MS. ALIKHAN:  Well, there's
13    technically not a date.  But I was doing it to
14    rehabilitate -- on what date --
15              HEARING OFFICER JOHNSON:  Okay.  Well
16    -- okay.
17    BY MS. ALIKHAN:
18         Q.  On what date did you give this
19    interview?
20         A.  Excuse me.  What was the question?
21         Q.  On what date did you give this
22    interview; do you remember?
23         A.  No.  I don't remember the date.
24         Q.  Does that document refresh your memory
```

1   as to when you gave that statement?

2       A.   Yes.

3       Q.   What is the date?

4       A.   August.  Everything occurred during

5   the month of August.  The exact date, I don't

6   remember.

7           HEARING OFFICER JOHNSON:  Okay.  She

8   doesn't remember the date.

9           THE WITNESS:  The 26th of August.

10  BY MS. ALIKHAN:

11      Q.   Is there a reason why you didn't write

12  that in your other reports?

13      A.   Because my job is to make reports.

14  That is our responsibility.  We just cannot

15  write down very profound things.

16      Q.   What do you mean by that?

17      A.   I wouldn't be able to explain that,

18  but my job is to -- my job is solely to make --

19  to make my report, to put down what happened.

20  But that by itself, I did not put it down, no.

21          MS. ALIKHAN:  Okay.  No further

22  questions.

23

24

```
 1                RECROSS-EXAMINATION
 2   BY MR. FAHY:
 3        Q.   Superintendent's Exhibit Number 2 was
 4   not prepared by you, was it?
 5        A.   This one?
 6        Q.   Yes.
 7        A.   They did it, but I was saying it.
 8        Q.   Did you sign that document?
 9        A.   The original, yes.
10        Q.   Do you have the original before you?
11        A.   No.
12             MR. FAHY:  I have nothing further.
13             HEARING OFFICER JOHNSON:  Okay.  If
14   you want to unhook your microphone.  Thank you.
15                  (Witness Excused.)
16             HEARING OFFICER JOHNSON:  The City
17   have additional witnesses?
18             MS. ALIKHAN:  Yes.
19             HEARING OFFICER JOHNSON:  Let me just
20   ask who you're calling.
21             MS. ALIKHAN:  One additional
22   occurrence witness and then a foundational
23   witness for the DVD.
24             HEARING OFFICER JOHNSON:  Okay.  We've
```

1   heard from five witnesses now of what's

2   happened -- you can go -- five witnesses as to

3   what's happened in the emergency room.  I'm

4   beginning to think it's -- and we have a tape

5   as well.  I'm beginning to think it's

6   cumulative.

7            What is this witness, this

8   occurrence witness going to say that has not

9   already been said?

10           MS. ALIKHAN:  Well, I mean, it doesn't

11  go to that.  The assertion is made by the

12  Respondent that the conduct is not egregious

13  enough to warrant termination.  And by putting

14  on the evidence that we have, we'd like to

15  rebut that and actually show that it was

16  egregious enough.

17           HEARING OFFICER JOHNSON:  What's this

18  witness going to say that has not already been

19  said?

20           MS. ALIKHAN:  He's going to give his

21  account of what happened.

22           HEARING OFFICER JOHNSON:  Who is it?

23  Is it a security guard?

24           MS. ALIKHAN:  Yes, it is.

```
 1              HEARING OFFICER JOHNSON:  It's a third
 2    security guard?
 3              MS. ALIKHAN:  Yes.
 4              HEARING OFFICER JOHNSON:  Okay.  And
 5    he's witness to the event that took place in
 6    the triage area of the emergency room at
 7    Norwegian American Hospital?
 8              MS. ALIKHAN:  Yes.  That is correct.
 9              HEARING OFFICER JOHNSON:  Okay.  I
10    just -- I haven't seen the tape yet or the DVD.
11    It's -- given the -- but assuming that the
12    tape -- the tape shows the incident as well,
13    right?
14              MS. ALIKHAN:  That is correct.
15              HEARING OFFICER JOHNSON:  Okay.
16    Assuming there's a tape, assuming -- that shows
17    that, as you represent.  Given the officer's
18    admission, given the fact that we've heard four
19    occurrence witnesses on this, I really am not
20    sure what this is adding.  And so I would allow
21    you to make an offer of proof of what this
22    witness would say, but I think we've really --
23    it's really cumulative at this point.
24                   Let me add to this.  Is there
```

1    going to be witnesses called by the Respondent

2    that will -- who are occurrence witnesses in --

3    as to what happened in the triage room of the

4    Norwegian American Hospital?

5              MR. FAHY:  The only occurrence witness

6    is my client.

7              HEARING OFFICER JOHNSON:  Okay.  So

8    they're not -- they're not really disputing

9    this in any significant way that I can see.  Or

10   to the extent that they are, you've overwhelmed

11   them with four witnesses.

12             MS. ALIKHAN:  Okay.

13             HEARING OFFICER JOHNSON:  Which I'm

14   not -- it's not being critical of you.  I'm

15   just -- it's enough.  It's enough.  So if you

16   want to make an offer of proof that if called

17   this witness would say X, Y, and Z, I'd permit

18   that.

19             MS. ALIKHAN:  Well, I mean to be fair,

20   I think there's slight variations in the

21   admissions that the Respondent has made.  So I

22   think these occurrence witnesses are showing

23   that.

24             HEARING OFFICER JOHNSON:  What would

1    that be?  I mean, the issue in the case is he

2    was charged with using the blackjack or the --

3    you know, there's an issue about what it is he

4    exactly used, all right?  But he was using an

5    unauthorized weapon to bludgeon Randall Miles

6    after he was already restrained.  That's the

7    issue in the case.

8              I mean, I don't understand that

9    the officer's going to take the position that

10   he had authority to use that weapon or that

11   there was enough activity by Miles to justify

12   that use of that force.  I mean, that seems to

13   be the main issue in the case.

14             I'm just -- I don't want to cut

15   you short, but we're really -- it's really

16   redundant.  You're doing a good job.  You're

17   doing a very thorough job.

18             MS. ALIKHAN:  I mean, I haven't had

19   the opportunity to completely cross this -- or

20   you know, perform my adverse examination on

21   him, so I'm not exactly sure what he's going to

22   say.  So to not be able to put on witnesses at

23   this point and close my case in chief --

24             HEARING OFFICER JOHNSON:  Well, I'll

```
 1   tell you what, do you have the DVD --

 2          MS. ALIKHAN:  Yes.

 3          HEARING OFFICER JOHNSON:  -- ready to

 4   go?  Why don't we at this point recall Officer

 5   Cozzi.

 6          MR. FAHY:  Could I just have a couple

 7   minutes to use the men's room?

 8          HEARING OFFICER JOHNSON:  Okay.  Yeah.

 9   Let's take a -- I'll tell you what.  Let's take

10   a short recess.  My plan would be to have you

11   recall Officer Cozzi, ask him whatever you want

12   vis-a-vis the DVD.  That's where we stopped

13   last time.

14          MS. ALIKHAN:  Okay.

15          HEARING OFFICER JOHNSON:  And then

16   let's really see if you need additional

17   occurrence witnesses, okay?

18          MS. ALIKHAN:  Sure.

19          HEARING OFFICER JOHNSON:  All right.

20   So let's take a couple minute recess.

21                  (Break Taken)

22          HEARING OFFICER JOHNSON:  So we're

23   back on the record after an off-the-record

24   discussion about witnesses.  And at this point
```

```
1    we're going to have the City resume its adverse

2    examination of Officer Cozzi that was

3    interrupted by our technical problems earlier.

4    So if Officer Cozzi could come back up here and
```

REDACTED

REDACTED

PP 97 - 119

1    Okay.  So you can step down after you unhook

2    yourself.  All right, Officer?

3                    (Witness Excused.)

4            HEARING OFFICER JOHNSON:  Okay.  Now

5    City has an additional witness in terms of an

6    additional security guard based on our

7    off-the-record discussion, right?

8            MS. ALIKHAN:  That is correct.

9            HEARING OFFICER JOHNSON:  Okay.  So I

10   do not want to have cumulative testimony.  I

11   don't want a security guard to come in here and

12   describe everything that happened from

13   beginning to end because we've already heard it

14   four times and we have a -- we have a tape.

15           But I will let you call him on the

16   specific issues of whether there was an -- he

17   or she has any knowledge about an attempted

18   punch aimed at Estrada or Sebastian.  Or -- and

19   I will allow you to call that person to talk

20   about whether there was an attempted punch at

21   the officer.

22           MS. ALIKHAN:  All right.

23           HEARING OFFICER JOHNSON:  But I don't

24   want to hear over, you know, that the guy was

1    combative and he was verbally abusive.  We all

2    know that that's the case, okay?  So if you

3    want to call him for those two purposes, and

4    then if you want to make an offer of proof for

5    anything else, that would be fine.

6                        (Brief Pause)

7                        (The witness was duly sworn.)

8                        RALPH SNOW,

9    called as a witness herein, having been first

10   duly sworn, was examined and testified as

11   follows:

12                   DIRECT EXAMINATION

13   BY MS. ALIKHAN:

14       Q.   Please state and spell your name for

15   the record.

16       A.   My name is Ralph Snow, R-A-L-P-H,

17   S-N-O-W.

18       Q.   Are you employed?

19       A.   Yes, ma'am, I am.

20       Q.   Where are you employed?

21       A.   Norwegian American Hospital.

22       Q.   What's your position there?

23       A.   Security officer.

24       Q.   And how long have you been a security

122

1   officer?

2       A.   Over five years.

3       Q.   And were you working on August 2nd,

4   2005?

5       A.   Yes.

6       Q.   Okay.  And did you witness an incident

7   concerning a patient and Officer Cozzi?

8       A.   Yes, I did.

9       Q.   And where were you when that incident

10  was occurring?

11      A.   I was in the monitor room watching

12  monitors, TV screens.

13      Q.   You were in the monitor room?

14      A.   Yes.

15      Q.   And how far is the monitor room to --

16  in relation to the incident?

17      A.   Maybe about 15 feet.

18      Q.   15 feet?  Would you say you had a

19  clear view or was something obstructing your

20  view?

21      A.   No.  I was seeing clearly.

22      Q.   So when you saw -- you stated you saw

23  an incident.  And during that time that you

24  were observing the incident, did you ever see

123

1    the patient get up and lunge at Officer Cozzi?

2         A.   No, I didn't.

3         Q.   Did you ever see the patient at that

4    time that you observed -- did you see the

5    patient attempt to strike or lunge at Officer

6    Evelyn Estrada?

7         A.   No, I didn't.

8              HEARING OFFICER JOHNSON:   Okay.   And

9    one other thing I would allow too is since

10   there is an issue about how many blows, I don't

11   know that it's really that important, to be

12   honest, but how many blows were struck with the

13   blackjack.   If you want to inquire about that,

14   that would be okay.

15   BY MS. ALIKHAN:

16        Q.   During the time that you observed, did

17   you see the patient attempt to strike or lunge

18   at Security Officer Sebastian?

19        A.   No, I didn't.

20        Q.   Would you say that you saw the

21   incident from beginning to end?

22        A.   No, I didn't.

23        Q.   At what point did you -- did you begin

24   observing the incident?



1        A.   From the trash area, from the ER ramp

2    I heard the commotion of this patient being

3    loud and swearing and being unruly.

4        Q.   Okay.  Was the police officer already

5    on-site at that point?

6        A.   Not at that second, no.

7        Q.   At what -- and you said -- did you see

8    the incident until the end?

9        A.   I seen most of it, because I don't

10    know what happened after the officer and

11    security went inside the ER.

12        Q.   Okay.  So you saw up until they --

13        A.   They went into the emergency room

14    door, as far as I saw.

15        Q.   Did you see the officer strike the

16    patient with an object?

17        A.   Yes, I did.

18        Q.   And were you able to determine what

19    the object was?

20        A.   Yes, I did.

21        Q.   And as you know, what is it?

22        A.   It was a blackjack.

23        Q.   Were you able to determine how many

24    times the officer struck the patient with the

1  blackjack?

2        A.   About 10 or 11 times.

3        Q.   Do you know where the officer struck

4  the patient?

5        A.   Struck the patient here, shoulders,

6  and face.

7        Q.   So in the stomach, the shoulders, and

8  the face?

9        A.   Yes.

10        MS. ALIKHAN:  I have no further

11  questions at this time.

12        HEARING OFFICER JOHNSON:  Okay.

13  Cross-Examination.

14                CROSS-EXAMINATION

15  BY MR. FAHY:

16        Q.   You weren't the first security officer

17  on the scene, were you?

18        A.   No, sir, I wasn't.

19        Q.   Officer Estrada and --

20        A.   Sebastian.

21        Q.   -- Sebastian were the first

22  officers -- security officers dealing with the

23  patient, correct?

24        A.   Yes, sir.

1       **Q.**  And I'm not sure -- and did you say

2  Officer Cozzi was there when you came out of

3  the monitor room?

4       **A.**  Not at that time.  I went -- I stepped

5  out just to see the commotion because I needed

6  to keep an eye on the cameras.  That's what I

7  was supposed to be doing.  And then he kept on

8  doing -- being uncooperative and being loud, so

9  I just stood there, and then that's when I seen

10  a police officer and...

11       **Q.**  Okay.  Is that the first time you saw

12  a police officer there?

13       **A.**  At that time, yes, sir.

14       **Q.**  Do you know if that police officer was

15  there earlier before you came out of the

16  monitor room?

17       **A.**  Not as I'm aware of.

18       **Q.**  And the commotion that you're

19  describing, that's what brought you out of the

20  monitor room?

21       **A.**  Of the patient being loud, yes, sir.

22       **Q.**  Okay.  He was also combative?

23       **A.**  Well, he wasn't cooperating with the

24  ER staff, the triage nurse or the doctor or

1    anybody.  He was just...

2          Q.   Was he threatening the staff?

3          A.   Well, they were saying, but I -- I

4    couldn't make out word for word what he was

5    saying.

6          Q.   Okay.

7          A.   He was talking about his rights and

8    things like that, but...

9          Q.   But was he threatening the staff is my

10   question?

11              MS. ALIKHAN:  Objection to relevance.

12              HEARING OFFICER JOHNSON:  No,

13   overruled.

14   BY MR. FAHY:

15         Q.   Was he threatening the staff?

16         A.   I couldn't hear the threats.  I

17   couldn't make out exactly.

18         Q.   Did you prepare a report with regards

19   to this incident on August 8th of 2005?

20         A.   Yes, sir.  I did.

21         Q.   And did you write that report

22   yourself?

23         A.   Yes, sir, I did.

24         Q.   And did you summarize --

```
 1            MS. ALIKHAN:  Objection.  Beyond the
 2   scope of my Direct Examination.  I was only
 3   allowed to hit certain topics, so...
 4            HEARING OFFICER JOHNSON:  Right.
 5   Okay.  I'll let you redirect on this point of
 6   the threat.
 7   BY MR. FAHY:
 8       Q.  Did you sign that report after you
 9   prepared it?
10       A.  I believe so.
11       Q.  In that report did you state that the
12   patient was threatening the staff?
13       A.  Yes, sir, I did.
14       Q.  Why don't we do it this way.
15            MS. ALIKHAN:  Objection to what
16   report.  What's the date?
17            MR. FAHY:  I gave the date of August
18   8th.
19            THE WITNESS:  August 8th, '05.
20            MR. FAHY:  Well, just do it this way.
21   I believe this is Respondent's Exhibit --
22            HEARING OFFICER JOHNSON:  I think he
23   said did, right?  Wasn't that your answer that
24   yes, you did write that, that they did threaten
```

1  him?

2      MR. FAHY:  Yeah, but he appears to be

3  looking at a report --

4      MS. ALIKHAN:  Right.

5      MR. FAHY:  -- and I think we should

6  mark it as an exhibit.

7      HEARING OFFICER JOHNSON:  Okay.  Fine.

8      MR. FAHY:  And I think I'm on Number

9  5, so Respondent's Exhibit 5.

10 BY MR. FAHY:

11     Q.  Do you have that report with you?

12     A.  Yes, I do.

13     Q.  Okay.

14     HEARING OFFICER JOHNSON:  Actually,

15 let's call this Respondent's 3, right?

16     MR. FAHY:  I think I'm on Number 5.

17     HEARING OFFICER JOHNSON:  Okay.

18 BY MR. FAHY:

19     Q.  And just for the record, you were

20 looking at your report which has now been

21 marked as Respondent's Exhibit Number 5 when

22 you answered yes to the question, correct?

23     A.  Okay.

24     Q.  Well, just so I'm clear, does your

1    report -- in your report did you indicate that

2    he was threatening to the staff?

3        A.    Yes, it is.

4            MR. FAHY:  I have no further

5    questions.

6            HEARING OFFICER JOHNSON:  You want to

7    redirect on the threat?

8            MS. ALIKHAN:  No.

9            HEARING OFFICER JOHNSON:  No?  Okay.

10   All right.  Thanks for coming.  If you can

11   unhook your mike.  Thank you.

12                (Witness Excused.)

13           HEARING OFFICER JOHNSON:  Now, the

14   City has an additional witness?

15           MS. ALIKHAN:  No.  The City does not.

16           HEARING OFFICER JOHNSON:  Okay.  But

17   as I understand it, the City had a witness to

18   lay a foundation for the DVD, correct?

19           MS. ALIKHAN:  Correct.

20           HEARING OFFICER JOHNSON:  But with

21   respect to the DVD, just -- I can't remember if

22   we did this on the record, you have no

23   objection to its authenticity and to its

24   foundation?

1          MR. FAHY:  No, I do not.

2          HEARING OFFICER JOHNSON:  All right.

3    And you might want to make an offer into

4    evidence of the DVD.

5          MS. ALIKHAN:  To what it depicts?

6    What do you mean?

7          HEARING OFFICER JOHNSON:  Put the DVD

8    into evidence.

9          MS. ALIKHAN:  Oh, yeah.  I do want to

10   move for its admission.

11         HEARING OFFICER JOHNSON:  Okay.  Do

12   you have any objection to its admissibility as

13   opposed to its foundation?

14         MR. FAHY:  No.  I don't have any

15   objection.

16         HEARING OFFICER JOHNSON:  Okay.  Okay.

17   So that's received.

18                   (Superintendent's Exhibit No.

19                    1 received.)

20         HEARING OFFICER JOHNSON:  Okay.  Now

21   the City has -- and as long as we're on it, the

22   City's 1 is in evidence.  I did admit 3, 4, and

23   5 over the objection of Respondent.  City's 2 I

24   don't believe you ever offered.

1      MS. ALIKHAN:  We're not going to.

2      HEARING OFFICER JOHNSON:  And you're

3  not going to.  Okay.  Good.  And that's all you

4  have is City's 1 through 5, right?

5      MS. ALIKHAN:  Correct.

6      HEARING OFFICER JOHNSON:  Okay.  Now,

7  the City has one additional witness that you

8  were talking about for next time which is a use

9  of force expert; is that right?

10      MS. ALIKHAN:  Correct.

11      HEARING OFFICER JOHNSON:  You want to

12  identify that person?

13      MS. ALIKHAN:  Larry Snelling.

14      HEARING OFFICER JOHNSON:  Larry

15  Snelling?  Okay.

16      MS. ALIKHAN:  Yes.

17      HEARING OFFICER JOHNSON:  Do you see a

18  need at this point to call that witness?

19      MS. ALIKHAN:  I will not be handling

20  this case on August 17th, so I cannot speak for

21  the attorney that's going to be assigned to it.

22      HEARING OFFICER JOHNSON:  Okay.  I

23  don't see a need for that witness.  Assuming

24  that that witness is going to testify to the

133

1    use-of-force model that is taught at the

2    Chicago Police Academy and is going to testify

3    that an active resister cannot be subdued with

4    a closed fist or an impact weapon like a

5    blackjack or a slap -- flat slap -- flat sap,

6    whatever, because it's not an issue in the

7    case.

8                But if the City wants to make an

9    offer of proof as so what that witness would

10   say, that would be acceptable.  And if there is

11   some other issue that I'm not contemplating

12   that that witness is going to address, then the

13   City needs to let us know.  But actually, I

14   mean, it's only fair for me to ask you that at

15   this point.  Is there something else that they

16   were going to testify to?

17               MS. ALIKHAN:  No.  I mean, they would

18   testify to what they determined -- what type of

19   subject they determined the arrestee to be and

20   what the appropriate use of force was

21   dependent -- I mean, we understand that the

22   blackjack is not appropriate.  But they would

23   also call into question the assessment of the

24   police officer.  I mean, his determination as

1    to what type of offender.

2            HEARING OFFICER JOHNSON:  So they were

3    going to say that Mr. Miles was not an active

4    resister?

5            MS. ALIKHAN:  That is correct.

6            HEARING OFFICER JOHNSON:  They're

7    going to say that he was a passive resister?

8            MS. ALIKHAN:  They would -- they would

9    testify to something below the active.

10           HEARING OFFICER JOHNSON:  Okay.  Well,

11   there's only one other box which is passive

12   resister.

13           MS. ALIKHAN:  Right.  Or whatever they

14   determined, if he was a cooperative subject or

15   a passive resister under the active resister.

16           HEARING OFFICER JOHNSON:  They're

17   going to say that he was not an active

18   resister.  He was a passive resister.  That's

19   what you're saying?

20           MS. ALIKHAN:  Right.  Or I mean,

21   whatever they determine it to be under the

22   active resister, which to my knowledge is

23   passive, but I can't speak to that's exactly

24   what he's going to testify to, but it's going

```
 1    to be under the active resister --
 2              HEARING OFFICER JOHNSON:  When you say
 3    under, you mean less?
 4              MS. ALIKHAN:  Right.  Less than active
 5    resister.
 6              HEARING OFFICER JOHNSON:  So he's
 7    going to be active resister or less?
 8              MS. ALIKHAN:  Correct.
 9              HEARING OFFICER JOHNSON:  Okay.  But
10    in either of those cases, whether he's an
11    active resister or a passive resister there's
12    no ability to use a closed fist or an impact
13    weapon, right?
14              MS. ALIKHAN:  Or the open-hand strike,
15    I believe.
16              HEARING OFFICER JOHNSON:  But your
17    theory of the case is he didn't use an
18    open-hand strike.  He used a --
19              MS. ALIKHAN:  Right.  It bears on the
20    statement that he gave to OPS when he did
21    make -- when he stated -- and in his reports
22    that he did --
23              HEARING OFFICER JOHNSON:  Okay.  But
24    the testimony is -- and any expert witness can
```

1    only go off of whatever the actual testimony

2    is.  The testimony, as I understand it from

3    Officer Cozzi, is he never used an open hand.

4    He has said that that statement to OPS was not

5    correct, and that he also testified that he in

6    fact used the flat sap.

7           MS. ALIKHAN:  I guess I'm mistaken.  I

8    thought he testified that he did use the

9    open-hand strike prior to the handcuffing.

10           HEARING OFFICER JOHNSON:  That's not

11    what I heard.  So -- so I don't -- I don't see

12    a need for this witness, so I'm going to make

13    that ruling.  But if the City wants to make an

14    offer of proof next time as to what that

15    witness would testify to if called, that would

16    be fine.  Okay?

17           MR. FAHY:  Based on your ruling, is he

18    not going to testify?

19           HEARING OFFICER JOHNSON.  I would not

20    permit him to testify unless there's -- unless

21    you can make some argument that we haven't

22    heard yet.

23           MR. FAHY:  Should that change, I would

24    just like to have any kind of reports or notes

1    or anything that this person is relying on

2    because I haven't received anything.  If he

3    should --

4            MS. ALIKHAN:  There are no notes.

5            MR. FAHY:  Should something change, I

6    would like to be able to be prepared.

7            HEARING OFFICER JOHNSON:  Okay.  I

8    understand that.  So we'll then recess till

9    August 17th at which point we'll continue the

10   hearing.  Okay?

11           MR. FAHY:  Is the City -- is the City

12   resting at this point?

13           MS. ALIKHAN:  No.  The City is not.

14           MR. FAHY:  Just for scheduling

15   purposes, if we can get an idea how many

16   witnesses the City has left, just so I know.

17           MS. ALIKHAN:  We just -- I just have

18   that one, but like I said, it will be

19   reassigned.  So I mean, if somebody reads the

20   transcript and they want to add to it, I'm not

21   going to rest and foreclose that opportunity to

22   do so.

23           HEARING OFFICER JOHNSON:  Okay.  Well,

24   is it going to be reassigned --

1          MR. FAHY:  Do you know who it's going

2     to be --

3          MS. ALIKHAN:  No, I don't.

4          HEARING OFFICER JOHNSON:  Okay.  I

5     think it's a fair question for purposes of

6     scheduling.  So here's what I would say.  Is if

7     the City is going to call additional witnesses,

8     they need to apprise Mr. Fahey of that at least

9     a week before August 17th, okay?

10         MS. ALIKHAN:  Okay.

11         HEARING OFFICER JOHNSON:  All right.

12    Okay.  So we'll stand in recess.

13         MR. FAHY:  Thank you.

14                    (Which were all the

15                     proceedings had in the

16                     above-entitled cause this

17                     date and time.)

18

19

20

21

22

23

24

139

```
1   STATE OF ILLINOIS     )
                          ) SS.
2   COUNTY OF COOK        )

3

4              PAMELA A. STAFFORD, being first

5   duly sworn on oath says that she is a court

6   reporter doing business in the City of Chicago

7   and that she reported in shorthand the

8   proceedings of said hearing and that the

9   foregoing is a true and correct transcript of

10  her shorthand notes so taken as aforesaid and

11  contains the proceedings given at said hearing.

12

13

14

15  _____
    Notary Public, Cook County
16  Illinois,
    My Commission expires 5/31/2010

17

18           "OFFICIAL SEAL"
             Pamela A. Stafford
19      Notary Public, State of Illinois
        My Commission Exp. 05/31/2010

20

21

22

23

24
```

Office of Professional Standards

08 August 2005
CR 307992

To:    Chief Administrator
       Office of Professional Standards

From:   Inv. Kristi M. Lyons #232

Subject:   Office of Emergency Management and Communications (OEMC)
           Tape Transcription

**Playback will begin on August 2, 2005 at 12:59:35 hours**

OEMC    Chicago Emergency, Miller.

Unknown
Caller    Miller, could you holler on the Fireside?

OEMC    Yes.

Unknown
Caller    Send a Beat car to 5309 West North.  There's a stabbing.

OEMC    Alrighty.

Unknown
Caller    Okay.

OEMC    Alright you all already on the scene?

Unknown
Caller    Yes.

OEMC    Okay.

Unknown
Caller    Alright.

**Playback will begin on August 2, 2005 at 13:07:12 hours**

OEMC    Chicago Emergency, Lanem.

DeLuca    Lanem, DeLuca over on the Fire side.

OEMC    Hi.

Cozzi

CR 307992
Att. 53
HPD 00440

Office of Professional Standards
CR 307992
Page 2

| | |
|---|---|
| DeLuca | Hey Ambulance 48 is at a stabbing at 5309 West North Avenue. |
| OEMC | Uh huh. |
| DeLuca | And you guys got, I think that they said that three (3) cars were dispatched. One showed up and left and they need him back there. |
| OEMC | Okay. |
| DeLuca | They need a beat car or a supervisor to go over there. They need somebody over there. |
| OEMC | Okay. |
| DeLuca | Okay, thanks. |
| OEMC | Alright. |

**Playback will begin on August 2, 2005 at 12:40:30 hours**

| | |
|---|---|
| OEMC | Chicago Emergency Services |
| Female Caller | Yes, this man just got stabbed on North Avenue and Lockwood. He is standing in the doorway. Um, (inaudible) bleeding uh real bad. |
| OEMC | He's bleeding? What happened? Do you know what happened? |
| Female Caller | I don't know. All I know is somebody said that someone stabbed the man. I don't know. |
| OEMC | Oh, he is stabbed? |
| Female Caller | Yes he is stabbed. |
| OEMC | Stay on the line. Hold on ma'am. |
| OEMC | Fire Department, Canning. |
| Female Caller | There is a guy, yeah ma'am, um there is a guy been stabbed over here on Lockwood and North Avenue. |
| OEMC | North and Lockwood, right on the corner? |

Cozzi

CR 307992
OPS 53

Office of Professional Standards
CR 307992
Page 3

| | |
|---|---|
| Female Caller | Right on the corner. |
| OEMC | He's been stabbed? |
| Female Caller | Yes, he's been stabbed.  He's like in the building standing in the hallway like. |
| OEMC | All right, which building? |
| Female Caller | (talking to an unknown person in background, What's this? Okay, what's this, okay.) It's on the, um North Avenue.  (talking to an unknown person in background, What side is this? Westside of the street.) It is on the Westside of the street. |
| OEMC | West Side of Lockwood? |
| Female Caller | Westside, Southside, Westside of um, um North Avenue. |
| OEMC | On the Southside of North Avenue? |
| Female Caller | Yes. |
| OEMC | And west of Lockwood? |
| Female Caller | Right. |
| OEMC | The 5309 building? |
| Female Caller | That's true.  I think that is what it is, too. |
| OEMC | 5309 West North Avenue? |
| Female Caller | Yes. |
| OEMC | In the lobby, he's in there? |
| Female Caller | He's standing in the doorway (inaudible) lobby. |

Cozzi                                                    000442

CR307992
OH.53

Office of Professional Standards
CR 307992
Page 4

| | |
|---|---|
| OEMC | How old is he?  Do you know? |
| Female Caller | I do not know how old is this man is.  He's got to be up there in age. |
| OEMC | Eighties (80's)? |
| Female Caller | No, he's not that old.  I would say maybe in his sixties (60's) |
| OEMC | In his sixties (60's)? |
| Female Caller | Fifty-nine (59) to sixty (60) somewhere up in there. |
| OEMC | He's awake and breathing, right? |
| Female Caller | Yeah, he is.  I'm not at his at him right now because somebody let me know that this man was stabbed, so I'm just calling.  I see a police cars over there but (inaudible) |
| OEMC | Do you know where he is stabbed at ma'am? |
| Female Caller | In the shoulder, I think? |
| OEMC | In the shoulder? |
| Female Caller | Yes. |
| OEMC | Okay.  What is your phone number? |
| Female Caller | Oh, I'm on somebody's cell number. |
| OEMC | Okay, do you even want to give it out? |
| Female Caller | I don't even know their cell number, somebody just let me use their phone. |
| OEMC | Oh, okay.  Alrighty, we'll be right there.  You're not with this guy right now, are you? |
| Female Caller | No, I'm not.  I can go down there and wait though. |

Cozzi

CR 307992
OPS. 53
0004

Office of Professional Standards
CR 307992
Page 5

| | |
|---|---|
| OEMC | You're going to back down there, you said? |
| Female Caller | I'll go back around there. |
| OEMC | Okay, were on the way over there right now.  Watch for us, okay? |
| Female Caller | Okay. |
| OEMC | We'll see you there. |
| Female Caller | Okay, pardon me. |
| OEMC | We're on the way over there right now, ma'am. |
| Female Caller | Okay. |
| OEMC | Okay. |

**Playback will begin on August 2, 2005 at 13:05:06 hours**

| | |
|---|---|
| OEMC | 2534 |
| 2534 | 2534 |
| OEMC | I need you to ride with fire on a person stabbed.  5309 West North Avenue. 016th District had a 5309 Lockwood and they said that they had a bad address on their end. |
| 2534 | Inaudible |
| OEMC | Okay, Fire. |
| 2510 | I'm going to back him up over there, squad. |
| 2532 | 2532 |
| OEMC | 2532 |
| 2532 | I'm clear from lunch, I'll head that way, squad. |
| OEMC | 33, you were trying to come in. |

Cozzi

CR 307992
OPS 53

Office of Professional Standards
CR 307992
Page 6

2533      I drove right by there, that was like ten (10), when you gave me my job on
          Monticello.  The ambulance is probably long gone by now.  They were
          putting someone in the ambulance though.  So there was probably a
          removal from that location.

OEMC      We're going to call them and double check, thank you though.  Standby
          for your information.

**Playback will begin on August 2, 2005 at 13:10:10 hours**

2534      2534

OEMC      2534

2534      Give a slowdown.  We don't see anybody.  Is it supposed to be inside?

OEMC      Hang on, let me look 2534 it doesn't say because we also got a second
          ticket that said ambulance was on the scene.  It doesn't say inside or
          outside.

2534      Did the ambulance make a removal?

OEMC      To Norwegian, but like I said that's got a ticket that I just duped out that
          said that they were still on the scene.

**Playback will begin on August 2, 2005 at 13:40:20 hours**

2534      2534

OEMC      2534

2534      (Inaudible) highly intoxicated or is combative with nurses but he's got a
          minor cut.  It's not life threatening.

OEMC      All right.

**Playback will begin on August 2, 2005 at 13:45:10 hours**

2534      2534

OEMC      2534

2534      Just notify my sergeant.  This victim here uh he is highly intoxicated and
          he tried to take a swing at both me and the security guards.  So we I think
          we'll place him into custody, so after he gets looked at by the doctor, he's
          going to be going back to jail, back to 025.

                    Cozzi                              000445

## ** INFORMATION INDICTMENT RETURN SHEET **

|  |  |  |  | ARRAIGNMENT |
|---|---|---|---|---|
| CASE NO. | IR | DEFENDANT | NO. | DATE |
|  |  |  |  | AZR |
| 06CR-764 |  | WILLIAM COZZI | 1 |  |
|  |  |  |  | 01/19/2006 |

GJ- 366

FBI-         Sex: M  Race: W  DOB: 04/30/1957
ISB-         Add: 7218 W Seminole
CB-PRINTATARR       Chicago, IL 60631
RD/AR: CR307992 Arrest Agy: Cook County Sao Inv
             Arrest Date: 08/02/2005
DIRECT INDICTMENT                12/28/2005
ASA: Matthew Thrun            Unit: Special Pros

| Chg: | 1 | Agg Battery/Weapon/No Firearm | | |
|---|---|---|---|---|
|  |  | 720-5\12-4(B)(1) | 0000935100 | Class: 3 |
| Chg: | 2 | Agg Battery/Weapon/No Firearm | | |
|  |  | 720-5\12-4(B)(1) | 0000935100 | Class: 3 |
| Chg: | 3 | Agg Battery/Public Place | | |
|  |  | 720-5\12-4(B)(8) | 0000935800 | Class: 3 |
| Chg: | 4 | Offl Misconduct/Forbidden Act | | |
|  |  | 720-5\33-3(B) | 0001430100 | Class: 3 |
| Chg: | 5 | Offl Misconduct/Forbidden Act | | |
|  |  | 720-5\33-3(B) | 0001430100 | Class: 3 |
| Chg: | 6 | Offl Misconduct/Forbidden Act | | |
|  |  | 720-5\33-3(B) | 0001430100 | Class: 3 |
| Chg: | 7 | Offl Misconduct/Forbidden Act | | |
|  |  | 720-5\33-3(B) | 0001430100 | Class: 3 |
| Chg: | 8 | Offl Misconduct/Forbidden Act | | |
|  |  | 720-5\33-3(B) | 0001430100 | Class: 3 |
| Chg: | 9 | Offl Misconduct/Forbidden Act | | |
|  |  | 720-5\33-3(B) | 0001430100 | Class: 3 |
| Chg: | 10 | Offl Misconduct/Forbidden Act | | |
|  |  | 720-5\33-3(B) | 0001430100 | Class: 3 |
| Chg: | 11 | Offl Misconduct/Forbidden Act | | |
|  |  | 720-5\33-3(B) | 0001430100 | Class: 3 |
| Chg: | 12 | Offl Misconduct/Forbidden Act | | |
|  |  | 720-5\33-3(B) | 0001430100 | Class: 3 |
| Chg: | 13 | Offl Misconduct/Forbidden Act | | |
|  |  | 720-5\33-3(B) | 0001430100 | Class: 3 |
| Chg: | 14 | Offl Misconduct/Forbidden Act | | |
|  |  | 720-5\33-3(B) | 0001430100 | Class: 3 |
| Chg: | 15 | Offl Misconduct/Forbidden Act | | |
|  |  | 720-5\33-3(B) | 0001430100 | Class: 3 |
| Chg: | 16 | Battery | | |
|  |  | 720-5\12-3 | 0000930000 | Class: A |
| Chg: | 17 | Battery | | |
|  |  | 720-5\12-3 | 0000930000 | Class: A |

C.R. 307992
ATTACHMENT # 60A

Cozzi

000267

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

STATE OF ILLINOIS )
             ) SS.
COUNTY OF COOK   )

### The DECEMBER, 2005 Grand Jury of the
### Circuit Court of Cook County.

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about **August 2, 2005** at and within the County of Cook, Illinois.

### WILLIAM COZZI

committed the offense of **AGGRAVATED BATTERY**

in that HE, INTENTIONALLY OR KNOWINGLY, WITHOUT LEGAL JUSTIFICATION, CAUSED BODILY HARM TO RANDLE MILES WHILE USING A DEADLY WEAPON OTHER THAN BY THE DISCHARGE OF A FIREARM, TO WIT: HE STRUCK RANDLE MILES ABOUT HIS HEAD AND/OR BODY WITH A BLACK-JACK TYPE WEAPON, CAUSING SWELLING TO RANDLE MILES' LIP AND/OR PAIN TO RANDLE MILES' BODY, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 12-4(b)(1) OF THE ILLINOIS COMPILED STATUTES 1992, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

                              Criminal Code: 935100
                              CASE NO. 06CR-764

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

C. R. 307992

ATTACHMENT # 60A

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about **August 2, 2005** at and within the County of Cook, Illinois.

## WILLIAM COZZI

committed the offense of  **AGGRAVATED BATTERY**

in that    HE, INTENTIONALLY OR KNOWINGLY, WITHOUT LEGAL JUSTIFICATION, CAUSED BODILY HARM TO RANDLE MILES, TO WIT: HE STRUCK RANDLE MILES ABOUT THE HEAD AND/OR BODY, CAUSING SWELLING TO RANDLE MILES' LIP AND/OR PAIN TO RANDLE MILES' BODY, WHILE THEY WERE ON OR ABOUT A PUBLIC PLACE OF ACCOMMODATION, TO WIT: A LOBBY OF NORWEGIAN AMERICAN HOSPITAL, 1044 N. FRANCISCO, CHICAGO, COOK COUNTY, ILLINOIS, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 12-4(b)(8) OF THE ILLINOIS COMPILED STATUTES 1992, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

**Criminal Code: 935800**
**CASE NO. 06CR-764**

C. R. *307992*

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about **August 2, 2005** at and within the County of Cook, Illinois.

## WILLIAM COZZI

committed the offense of **OFFICIAL MISCONDUCT**

in that HE, BEING A PUBLIC EMPLOYEE IN HIS OFFICIAL CAPACITY, TO WIT: A CITY OF CHICAGO POLICE OFFICER, KNOWINGLY PERFORMED AN ACT WHICH HE KNEW HE WAS FORBIDDEN BY LAW TO PERFORM, TO WIT: HE COMMITTED THE OFFENSE OF AGGRAVATED BATTERY IN THAT HE, INTENTIONALLY OR KNOWINGLY, WITHOUT LEGAL JUSTIFICATION, CAUSED BODILY HARM TO RANDLE MILES WHILE USING A DEADLY WEAPON OTHER THAN BY THE DISCHARGE OF A FIREARM, TO WIT: HE STRUCK RANDLE MILES ABOUT HIS HEAD AND/OR BODY WITH A BLACK-JACK TYPE WEAPON, CAUSING SWELLING TO RANDLE MILES' LIP AND/OR PAIN TO RANDLE MILES'
BODY, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 12-4(b)(1) OF THE ILLINOIS COMPILED STATUTES, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 33-3(b) OF THE ILLINOIS COMPILED STATUTES 1994 AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Criminal Code: 1430100
CASE NO. 06CR-764

C.R. 307992
ATTACHMENT # 60 A

Cozzi

000270

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about **August 2, 2005** at and within the County of Cook, Illinois.

## WILLIAM COZZI

committed the offense of **OFFICIAL MISCONDUCT**

in that HE, BEING A PUBLIC EMPLOYEE IN HIS OFFICIAL CAPACITY, TO WIT: A CITY OF CHICAGO POLICE OFFICER, KNOWINGLY PERFORMED AN ACT WHICH HE KNEW HE WAS FORBIDDEN BY LAW TO PERFORM, TO WIT: HE COMMITTED THE OFFENSE OF AGGRAVATED BATTERY IN THAT HE, INTENTIONALLY OR KNOWINGLY, WITHOUT LEGAL JUSTIFICATION, CAUSED BODILY HARM TO RANDLE MILES WHILE USING A DEADLY WEAPON OTHER THAN BY THE DISCHARGE OF A FIREARM, TO WIT: HE STRUCK RANDLE MILES ABOUT HIS HEAD AND/OR BODY WITH A BLUDGEON, CAUSING SWELLING TO RANDLE MILES' LIP AND/OR PAIN TO RANDLE MILES' BODY, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 12-4(b)(1) OF THE ILLINOIS COMPILED STATUTES, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 33-3(b) OF THE ILLINOIS COMPILED STATUTES 1994 AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Criminal Code: 1430100
CASE NO. 06CR-764

C.R. 307992

ATTACHMENT # 60A

000271

Cozzi

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about **August 2, 2005** at and within the County of Cook, Illinois.

### WILLIAM COZZI

committed the offense of **OFFICIAL MISCONDUCT**

in that HE, BEING A PUBLIC EMPLOYEE IN HIS OFFICIAL CAPACITY, TO WIT: A CITY OF CHICAGO POLICE OFFICER, KNOWINGLY PERFORMED AN ACT WHICH HE KNEW HE WAS FORBIDDEN BY LAW TO PERFORM, TO WIT: HE COMMITTED THE OFFENSE OF AGGRAVATED BATTERY IN THAT HE, INTENTIONALLY OR KNOWINGLY, WITHOUT LEGAL JUSTIFICATION, CAUSED BODILY HARM TO RANDLE MILES, TO WIT: HE STRUCK RANDLE MILES ABOUT HIS HEAD AND/OR BODY, CAUSING SWELLING TO RANDLE MILES' LIP AND/OR PAIN TO RANDLE MILES' BODY, WHILE THEY WERE ON OR ABOUT A PUBLIC PLACE OF ACCOMMODATION, TO WIT: A LOBBY OF NORWEGIAN AMERICAN HOSPITAL, 1044 N. FRANCISCO, CHICAGO, COOK COUNTY, ILLINOIS, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 12-4(b)(8) OF THE ILLINOIS COMPILED STATUTES, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 33-3(b) OF THE ILLINOIS COMPILED STATUTES 1994 AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Criminal Code: 1430100
CASE NO. 06CR-764

C. R. 307992
ATTACHMENT # 60 A
000272

Cozzi

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about **August 2, 2005** at and within the County of Cook, Illinois.

### WILLIAM COZZI

committed the offense of **OFFICIAL MISCONDUCT**

in that HE, BEING A PUBLIC EMPLOYEE IN HIS OFFICIAL CAPACITY, TO WIT: A CITY OF CHICAGO POLICE OFFICER, KNOWINGLY PERFORMED AN ACT WHICH HE KNEW HE WAS FORBIDDEN BY LAW TO PERFORM, TO WIT: HE COMMITTED THE OFFENSE OF BATTERY, IN THAT HE, INTENTIONALLY OR KNOWINGLY WITHOUT LEGAL JUSTIFICATION, CAUSED BODILY HARM TO RANDLE MILES, TO WIT: HE STRUCK RANDLE MILES ABOUT HIS HEAD AND/OR BODY, CAUSING SWELLING TO RANDLE MILES' LIP AND/OR PAIN TO RANDLE MILES' BODY, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 12-3(a)(1) OF THE ILLINOIS COMPILED STATUTES, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 33-3(b) OF THE ILLINOIS COMPILED STATUTES 1994 AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Criminal Code: 1430100
CASE NO. 06CR-764

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

C. R. *307992*
0002 ATTACHMENT # *60A*

Cozzi

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about **August 2, 2005** at and within the County of Cook, Illinois.

## WILLIAM COZZI

committed the offense of **OFFICIAL MISCONDUCT**

in that   HE, BEING A PUBLIC EMPLOYEE IN HIS OFFICIAL CAPACITY, TO WIT: A CITY OF CHICAGO POLICE OFFICER, KNOWINGLY PERFORMED AN ACT WHICH HE KNEW HE WAS FORBIDDEN BY LAW TO PERFORM, TO WIT: HE COMMITTED THE OFFENSE OF BATTERY, IN THAT HE, INTENTIONALLY OR KNOWINGLY WITHOUT LEGAL JUSTIFICATION, MADE PHYSICAL CONTACT OF AN INSULTING OR PROVOKING NATURE WITH RANDLE MILES, TO WIT: HE STRUCK RANDLE MILES ABOUT HIS HEAD AND/OR BODY, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 12-3(a)(2) OF THE ILLINOIS COMPILED STATUTES, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 33-3(b) OF THE ILLINOIS COMPILED STATUTES 1994 AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Criminal Code: 1430100
CASE NO. 06CR-764

C.R. 307992
0003ACHMENT # 60A

Cozzi

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about **August 2, 2005** at and within the County of Cook, Illinois.

### WILLIAM COZZI

committed the offense of **OFFICIAL MISCONDUCT**

in that HE, BEING A PUBLIC EMPLOYEE IN HIS OFFICIAL CAPACITY, TO WIT: A CITY OF CHICAGO POLICE OFFICER, KNOWINGLY PERFORMED AN ACT WHICH HE KNEW HE WAS FORBIDDEN BY LAW TO PERFORM, TO WIT: VIOLATED ARTICLE V, RULE 1 OF THE CITY OF CHICAGO DEPARTMENT OF POLICE RULES & REGULATIONS WHICH STATES:

    "PROHIBITED ACTS INCLUDE: VIOLATION OF ANY LAW OR ORDINANCE"

IN THAT HE COMMITTED THE OFFENSE OF AGGRAVATED BATTERY, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 12-4(b) OF THE ILLINOIS COMPILED STATUTES, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 33-3(b) OF THE ILLINOIS COMPILED STATUTES 1994 AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

                             Criminal Code: 1430100
                             CASE NO. 06CR-764

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about **August 2, 2005** at and within the County of Cook, Illinois.

### WILLIAM COZZI

committed the offense of **OFFICIAL MISCONDUCT**

in that HE, BEING A PUBLIC EMPLOYEE IN HIS OFFICIAL CAPACITY, TO WIT: A CITY OF CHICAGO POLICE OFFICER, KNOWINGLY PERFORMED AN ACT WHICH HE KNEW HE WAS FORBIDDEN BY LAW TO PERFORM, TO WIT: VIOLATED ARTICLE V, RULE 1 OF THE CITY OF CHICAGO DEPARTMENT OF POLICE RULES & REGULATIONS WHICH STATES:

> "PROHIBITED ACTS INCLUDE: VIOLATION OF ANY LAW OR ORDINANCE"

IN THAT HE COMMITTED THE OFFENSE OF BATTERY, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 12-3(a) OF THE ILLINOIS COMPILED STATUTES, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 33-3(b) OF THE ILLINOIS COMPILED STATUTES 1994 AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

**Criminal Code: 1430100**
**CASE NO. 06CR-764**

C.R. 307992

0002 ATTACHMENT # 60A

Cozzi

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about **August 2, 2005** at and within the County of Cook, Illinois.

## WILLIAM COZZI

committed the offense of **OFFICIAL MISCONDUCT**

in that  HE, BEING A PUBLIC EMPLOYEE IN HIS OFFICIAL CAPACITY, TO WIT: A CITY OF CHICAGO POLICE OFFICER, KNOWINGLY PERFORMED AN ACT WHICH HE KNEW HE WAS FORBIDDEN BY LAW TO PERFORM, TO WIT: VIOLATED ARTICLE V, RULE 2 OF THE CITY OF CHICAGO DEPARTMENT OF POLICE RULES & REGULATIONS WHICH STATES:

> "PROHIBITED ACTS INCLUDE: ANY ACTION OR CONDUCT WHICH IMPEDES THE DEPARTMENT'S EFFORTS TO ACHIEVE ITS POLICY AND GOALS OR BRINGS DISCREDIT UPON THE DEPARTMENT."

IN THAT HE, INTENTIONALLY OR KNOWINGLY WITHOUT LEGAL JUSTIFICATION, STRUCK RANDLE MILES ABOUT HIS HEAD AND/OR BODY WHILE RANDLE MILES WAS HANDCUFFED, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 33-3(b) OF THE ILLINOIS COMPILED STATUTES 1994 AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Criminal Code: 1430100
CASE NO. 06CR-764

C.R. 307992
ATTACHMENT # 60A

Cozzi

000277

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about **August 2, 2005** at and within the County of Cook, Illinois.

## WILLIAM COZZI

committed the offense of **OFFICIAL MISCONDUCT**

in that HE, BEING A PUBLIC EMPLOYEE IN HIS OFFICIAL CAPACITY, TO WIT: A CITY OF CHICAGO POLICE OFFICER, KNOWINGLY PERFORMED AN ACT WHICH HE KNEW HE WAS FORBIDDEN BY LAW TO PERFORM, TO WIT: VIOLATED ARTICLE V, RULE 8 OF THE CITY OF CHICAGO DEPARTMENT OF POLICE RULES & REGULATIONS WHICH STATES:

"PROHIBITED ACTS INCLUDE: DISRESPECT TO OR MALTREATMENT OF ANY PERSON, WHILE ON OR OFF DUTY."

IN THAT HE, INTENTIONALLY OR KNOWINGLY WITHOUT LEGAL JUSTIFICATION, STRUCK RANDLE MILES ABOUT HIS HEAD AND/OR BODY WHILE RANDLE MILES WAS HANDCUFFED, IN VIOLATION OF CHAPTER 720, ACT 5; SECTION 33-3(b) OF THE ILLINOIS COMPILED STATUTES 1994 AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Criminal Code: 1430100
CASE NO. 06CR-764

Cozzi

C. R. 307992

0002ATTACHMENT # 60A

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about **August 2, 2005** at and within the County of Cook, Illinois.

## WILLIAM COZZI

committed the offense of **OFFICIAL MISCONDUCT**

in that HE, BEING A PUBLIC EMPLOYEE IN HIS OFFICIAL CAPACITY, TO WIT: A CITY OF CHICAGO POLICE OFFICER, KNOWINGLY PERFORMED AN ACT WHICH HE KNEW HE WAS FORBIDDEN BY LAW TO PERFORM, TO WIT: VIOLATED ARTICLE V, RULE 9 OF THE CITY OF CHICAGO DEPARTMENT OF POLICE RULES & REGULATIONS WHICH STATES:

> "PROHIBITED ACTS INCLUDE: ENGAGING IN ANY UNJUSTIFIED VERBAL OR PHYSICAL ALTERCATION WITH ANY PERSON WHILE ON OR OFF DUTY."

IN THAT HE, INTENTIONALLY OR KNOWINGLY WITHOUT LEGAL JUSTIFICATION, STRUCK RANDLE MILES ABOUT HIS HEAD AND/OR BODY WHILE RANDLE MILES WAS HANDCUFFED, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 33-3(b) OF THE ILLINOIS COMPILED STATUTES 1994 AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Criminal Code: 1430100
CASE NO. 06CR-764

C.R. 307992
ATTACHMENT # 60A

Cozzi

000279

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about **August 2, 2005** at and within the County of Cook, Illinois.

### WILLIAM COZZI

committed the offense of **OFFICIAL MISCONDUCT**

in that HE, BEING A PUBLIC EMPLOYEE IN HIS OFFICIAL CAPACITY, TO WIT: A CITY OF CHICAGO POLICE OFFICER, KNOWINGLY PERFORMED AN ACT WHICH HE KNEW HE WAS FORBIDDEN BY LAW TO PERFORM, TO WIT: VIOLATED ARTICLE V, RULE 6 OF THE CITY OF CHICAGO DEPARTMENT OF POLICE RULES & REGULATIONS WHICH STATES:

"PROHIBITED ACTS INCLUDE: DISOBEDIENCE OF AN ORDER OR DIRECTIVE, WHETHER WRITTEN OR ORAL."

TO WIT: VIOLATED CITY OF CHICAGO DEPARTMENT OF POLICE GENERAL ORDER 02 – 08, ITEM III – A, TITLED: USE OF FORCE GUIDELINES, WHICH STATES:

"WHEN A DEPARTMENT MEMBER ENGAGES A MEMBER OF THE PUBLIC, THE MEMBER WILL DO SO IN SUCH A MANNER WHICH AFFORDS THAT PERSON THE RESPECT AND DIGNITY TO WHICH ALL PERSONS ARE ENTITLED. THE USE OF EXCESSIVE FORCE OR UNWARRANTED PHYSICAL FORCE OR UNPROFESSIONAL CONDUCT BY A DEPARTMENT MEMBER WILL NOT BE TOLERATED UNDER ANY CIRCUMSTANCES"

IN THAT HE, INTENTIONALLY OR KNOWINGLY, USED EXCESSIVE OR UNWARRANTED PHYSICAL FORCE BY STRIKING RANDLE MILES, A MEMBER OF THE PUBLIC, ABOUT HIS HEAD AND/OR BODY WHILE RANDLE MILES WAS HANDCUFFED, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 33-3(b) OF THE ILLINOIS COMPILED STATUTES 1994 AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Criminal Code: 1430100
CASE NO. 06CR-764

C.R. 307992
ATTACHMENT # 60A
0002BO

Cozzi

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about **August 2, 2005** at and within the County of Cook, Illinois.

### WILLIAM COZZI

committed the offense of **BATTERY**

in that    HE, INTENTIONALLY OR KNOWINGLY, WITHOUT LEGAL JUSTIFICATION, CAUSED BODILY HARM TO RANDLE MILES, TO WIT: HE STRUCK RANDLE MILES ABOUT HIS HEAD AND/OR BODY, CAUSING SWELLING TO RANDLE MILES' LIP AND/OR PAIN TO RANDLE MILES' BODY, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 12-3(a)(1) OF THE ILLINOIS COMPILED STATUTES 1992, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Criminal Code: 930000
CASE NO. 06CR-764

C.R. 307992
ATTACHMENT # 60A
000281

Cozzi

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about **August 2, 2005** at and within the County of Cook, Illinois.

### WILLIAM COZZI

committed the offense of  **BATTERY**

in that    HE, INTENTIONALLY OR KNOWINGLY WITHOUT LEGAL JUSTIFICATION, MADE PHYSICAL CONTACT OF AN INSULTING OR PROVOKING NATURE WITH RANDLE MILES, TO WIT: HE STRUCK RANDLE MILES ABOUT HIS HEAD AND/OR BODY, IN VIOLATION OF CHAPTER 720, ACT 5, SECTION 12-3(a)(2) OF THE ILLINOIS COMPILED STATUTES 1992, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Criminal Code: 930000
CASE NO. 06CR-764

C. R. 307992
ATTACHMENT # 60A
000282

Cozzi

ADMINISTRATIVE PROCEEDING RIGHTS (Statutory)
/NOTIFICATION OF CHARGES/ALLEGATIONS
CHICAGO POLICE DEPARTMENT

GIVEN TO ACCUSED
DATE *14SEP05*    TIME *1040*

| NAME OF ACCUSED | RANK | STAR NO. | UNIT OF ASSIGNMENT |
|---|---|---|---|
| William Cozzi | PO | 4129 | 025 |

## ADMINISTRATIVE PROCEEDINGS RIGHTS (Statutory)

The law provides that you are to be advised of the following:

1.  Any admission or statement made by you in the course of this hearing, interrogation or examination may be used as the basis for your suspension or as the basis for charges seeking your removal or discharge or suspension in excess of 30 days.

2.  You have the right to counsel of your choosing to be present with you to advise you at this hearing, interrogation or examination and you may consult with him as you desire.

3.  You have a right to be given a reasonable time to obtain counsel of your own choosing.

4.  You have no right to remain silent. You have an obligation to truthfully answer questions put to you. You are advised that your statements or responses constitute an official police report.

5.  If you refuse to answer questions put to you, you will be ordered by a superior officer to answer the questions.

6.  If you persist in your refusal after the order has been given to you, you are advised that such refusal constitutes a violation of the Rules and Regulations of the Chicago Police Department and will serve as a basis for which your discharge will be sought.

7.  You are further advised that by law any admission or statement made by you during the course of this hearing, interrogation or examination and the fruits hereof cannot be used against you in a subsequent criminal proceedings.

## CHARGES/ALLEGATIONS

The law provides that if you are to be charged with criminal offense or if your separation from the Department will be sought, you are to be advised in writing of the specific illegal or improper acts alleged against or attributed to you.

Furthermore, Department policy provides that you have a right to be advised in writing of the names of complainants and the allegations against you prior to any questioning of you concerning the allegations regardless of the nature of the allegation and even if the allegation is such that it will not result in the filing of criminal charges or the filing of separation charges.

Accordingly, you are hereby advised that the following allegations have been attributed to you:

COMPLAINANTS:
1.  Michael O'Grady (complainant)
2.  Randle Miles (victim)
3.  OPS Inv. Kristi M. Lyons #232

It is alleged that on 02 August 2005, at approximately 1345 hours, inside Norwegian American Hospital, located at 1044 North Francisco, and during the course of the arrest of Randle Miles; you:
-   physically maltreated Miles;
-   were in possession of unauthorized equipment/weapon; and
-   provided a false report relative to circumstances of the arrest of Randle Miles.

The undersigned hereby acknowledges that he was informed of the rights listed above and acknowledges receipt in writing of the charges or allegations against him.

Signature _PO W/N 4129_

Witnesses: _Kristi Lyons #232_

| COMPLAINT REGISTER NO. | ATTACHMENT NO. |
|---|---|
| 307992 | 54 |

CPD-44.105 (REV. 2/04)    PREPARE IN DUPLICATE: Original to investigator's file, copy to accused member.

| ADMINISTRATIVE PROCEEDING RIGHTS (Statutory) /NOTIFICATION OF CHARGES/ALLEGATIONS CHICAGO POLICE DEPARTMENT | | GIVEN TO ACCUSED DATE *8/10/05* | | TIME *1300* |
|---|---|---|---|---|
| NAME OF ACCUSED<br>William Cozzi | RANK<br>PO | STAR NO.<br>4129 | UNIT OF ASSIGNMENT<br>025 | |

## ADMINISTRATIVE PROCEEDINGS RIGHTS (Statutory)

The law provides that you are to be advised of the following:

1.  Any admission or statement made by you in the course of this hearing, interrogation or examination may be used as the basis for your suspension or as the basis for charges seeking your removal or discharge or suspension in excess of 30 days.

2.  You have the right to counsel of your choosing to be present with you to advise you at this hearing, interrogation or examination and you may consult with him as you desire.

3.  You have a right to be given a reasonable time to obtain counsel of your own choosing.

4.  You have no right to remain silent. You have an obligation to truthfully answer questions put to you. You are advised that your statements or responses constitute an official police report.

5.  If you refuse to answer questions put to you, you will be ordered by a superior officer to answer the questions.

6.  If you persist in your refusal after the order has been given to you, you are advised that such refusal constitutes a violation of the Rules and Regulations of the Chicago Police Department and will serve as a basis for which your discharge will be sought.

7.  You are further advised that by law any admission or statement made by you during the course of this hearing, interrogation or examination and the fruits hereof cannot be used against you in a subsequent criminal proceedings.

## CHARGES/ALLEGATIONS

The law provides that if you are to be charged with criminal offense or if your separation from the Department will be sought, you are to be advised in writing of the specific illegal or improper acts alleged against or attributed to you.

Furthermore, Department policy provides that you have a right to be advised in writing of the names of complainants and the allegations against you prior to any questioning of you concerning the allegations regardless of the nature of the allegation and even if the allegation is such that it will not result in the filing of criminal charges or the filing of separation charges.

Accordingly, you are hereby advised that the following allegations have been attributed to you:

COMPLAINANTS:
1.  Michael O'Grady (complainant)
2.  Randle Miles (victim)
3.  OPS Inv. Kristi M. Lyons #232

It is alleged that on 02 August 2005, at approximately 1345 hours, inside Norwegian American Hospital, located at 1044 North Francisco, and during the course of the arrest of Randle Miles; you:
-   physically maltreated Miles;
-   were in possession of unauthorized equipment/weapon; and
-   provided a false report relative to circumstances of the arrest of Randle Miles.

The undersigned hereby acknowledges that he was informed of the rights listed above and acknowledges receipt in writing of the charges or allegations against him.

Signature  *PO W Cozzi 4129*

Witnesses:

*[signature]*

*S. Carter #214*

| COMPLAINT REGISTER NO.<br>307992 | ATTACHMENT NO.<br>*56* |
|---|---|

CPD-44.105 (REV. 2/04)        PREPARE IN DUPLICATE: Original to investigator's file, copy to accused member.

| ADMINISTRATIVE PROCEEDING RIGHTS (Statutory) /NOTIFICATION OF CHARGES/ALLEGATIONS CHICAGO POLICE DEPARTMENT | | | GIVEN TO ACCUSED DATE 1/5//05 | | TIME 953 |
|---|---|---|---|---|---|
| NAME OF ACCUSED William Cozzi | RANK PO | STAR NO. 4129 | UNIT OF ASSIGNMENT 025 | | |

## ADMINISTRATIVE PROCEEDINGS RIGHTS (Statutory)

The law provides that you are to be advised of the following:

1.  Any admission or statement made by you in the course of this hearing, interrogation or examination may be used as the basis for your suspension or as the basis for charges seeking your removal or discharge or suspension in excess of 30 days.

2.  You have the right to counsel of your choosing to be present with you to advise you at this hearing, interrogation or examination and you may consult with him as you desire.

3.  You have a right to be given a reasonable time to obtain counsel of your own choosing.

4.  You have no right to remain silent. You have an obligation to truthfully answer questions put to you. You are advised that your statements or responses constitute an official police report.

5.  If you refuse to answer questions put to you, you will be ordered by a superior officer to answer the questions.

6.  If you persist in your refusal after the order has been given to you, you are advised that such refusal constitutes a violation of the Rules and Regulations of the Chicago Police Department and will serve as a basis for which your discharge will be sought.

7.  You are further advised that by law any admission or statement made by you during the course of this hearing, interrogation or examination and the fruits hereof cannot be used against you in a subsequent criminal proceedings.

## CHARGES/ALLEGATIONS

The law provides that if you are to be charged with criminal offense or if your separation from the Department will be sought, you are to be advised in writing of the specific illegal or improper acts alleged against or attributed to you.

Furthermore, Department policy provides that you have a right to be advised in writing of the names of complainants and the allegations against you prior to any questioning of you concerning the allegations regardless of the nature of the allegation and even if the allegation is such that it will not result in the filing of criminal charges or the filing of separation charges.

Accordingly, you are hereby advised that the following allegations have been attributed to you:

COMPLAINANTS:
1.  Michael O'Grady (complainant)
2.  Randle Miles (victim)
3.  OPS Inv. Kristi M. Lyons #232

It is alleged that on 02 August 2005, at approximately 1345 hours, inside Norwegian American Hospital, located at 1044 North Francisco, and during the course of the arrest of Randle Miles; you:
-   physically maltreated Miles;
-   were in possession of unauthorized equipment/weapon; and
-   provided a false report relative to circumstances of the arrest of Randle Miles.

The undersigned hereby acknowledges that he was informed of the rights listed above and acknowledges receipt in writing of the charges or allegations against him.

Signature _PO W Cozzi 4129 15pp 5/05_

Witnesses: _K. Lyons #232_

_D. Carter #214_

| COMPLAINT REGISTER NO. 307992 | ATTACHMENT NO. 5B |
|---|---|

CPD-44.105 (REV. 2/04)    PREPARE IN DUPLICATE: Original to investigator's file, copy to accused member.

PEOPLE OF THE STATE OF ILLINOIS

VS                          NUMBER 06CR0076401

WILLIAM    COZZI

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
with the Clerk of the Circuit Court.

Charging the above named defendant with:

| | | |
|---|---|---|
| 720-5/12-4(b)(1) | F | AGG BATTERY/WEAPON/NO FIREARM |
| 720-5/12-4(b)(1) | F | AGG BATTERY/WEAPON/NO FIREARM |
| 720-5/12-4(b)(8) | F | AGG BATTERY/PUBLIC PLACE |
| 720-5/33-3(b) | F | OFFL MISCONDUCT/FORBIDDEN ACT |
| 720-5/33-3(b) | F | OFFL MISCONDUCT/FORBIDDEN ACT |
| 720-5/33-3(b) | F | OFFL MISCONDUCT/FORBIDDEN ACT |
| 720-5/33-3(b) | F | OFFL MISCONDUCT/FORBIDDEN ACT |
| 720-5/33-3(b) | F | OFFL MISCONDUCT/FORBIDDEN ACT |
| 720-5/33-3(b) | F | OFFL MISCONDUCT/FORBIDDEN ACT |
| 720-5/33-3(b) | F | OFFL MISCONDUCT/FORBIDDEN ACT |
| 720-5/33-3(b) | F | OFFL MISCONDUCT/FORBIDDEN ACT |
| 720-5/33-3(b) | F | OFFL MISCONDUCT/FORBIDDEN ACT |
| 720-5/33-3(b) | F | OFFL MISCONDUCT/FORBIDDEN ACT |
| 720-5/33-3(b) | F | OFFL MISCONDUCT/FORBIDDEN ACT |
| 720-5/12-3 | M | BATTERY |
| 720-5/12-3 | M | BATTERY |

The following disposition(s) was/were rendered before the Honorable Judge(s):

| | | |
|---|---|---|
| 01/05/06 IND/INFO-CLK OFFICE-PRES JUDGE | 01/19/06 1701 | |
|    06CR0076401 ID# CR100021117 | | |
| 01/19/06 CASE ASSIGNED | 01/19/06 1703 | |
|    BIEBEL, PAUL JR. | | |
| 01/19/06 APPEARANCE FILED | 00/00/00 | |
|    FOX, LAWRENCE P. | | |
| 01/19/06 DEFENDANT ARRAIGNED | 00/00/00 | |
|    FOX, LAWRENCE P. | | |
| 01/19/06 PLEA OF NOT GUILTY | 00/00/00 | |
|    FOX, LAWRENCE P. | | |
| 01/19/06 BAIL AMOUNT SET | 00/00/00 | $  50000 |
|    FOX, LAWRENCE P. | | |
| 01/19/06 O/C ONLY REL DEF ON C/D BOND | 00/00/00 | |
|    FOX, LAWRENCE P. | | |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 002

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 06CR0076401

    WILLIAM    COZZI

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

| Date | Entry | Date 2 | | |
|---|---|---|---|---|
| 01/19/06 | DEF REM CUST CC SHERIF | 00/00/00 | | |
| | FOX, LAWRENCE P. | | | |
| 01/19/06 | DEFENDANT IN CUSTODY | 00/00/00 | | |
| | FOX, LAWRENCE P. | | | |
| 01/19/06 | PRISONER DATA SHEET TO ISSUE | 00/00/00 | | |
| | FOX, LAWRENCE P. | | | |
| 01/19/06 | FINGER PRINTING ORDERED | 00/00/00 | | |
| | FOX, LAWRENCE P. | | | |
| 01/19/06 | ADMONISH AS TO TRIAL IN ABSENT | 00/00/00 | | |
| | FOX, LAWRENCE P. | | | |
| 01/19/06 | CONTINUANCE BY AGREEMENT | 02/27/06 | | |
| | FOX, LAWRENCE P. | | | |
| 01/27/06 | SPECIAL ORDER | 00/00/00 | | |
| | NOTIFICATION OF MOTION SUBSTITUTION OF JUDGE | | | |
| 01/27/06 | HEARING DATE ASSIGNED | 01/31/06 | 1703 | |
| 01/31/06 | DEFENDANT ON BOND | 00/00/00 | | |
| | FOX, LAWRENCE P. | | | |
| 01/31/06 | MOTION TO SUBSTITUTE JUDGE | 00/00/00 | S | 2 |
| | FOX, LAWRENCE P. | | | |
| 01/31/06 | TRANSFERRED | 02/01/06 | 1701 | |
| | FOX, LAWRENCE P. | | | |
| 02/01/06 | CASE ASSIGNED | 02/01/06 | 1720 | |
| | BIEBEL, PAUL JR. | | | |
| 02/01/06 | DEFENDANT ON BOND | 00/00/00 | | |
| | KIRBY, JOHN P. | | | |
| 02/01/06 | CONTINUANCE BY AGREEMENT | 03/01/06 | | |
| | KIRBY, JOHN P. | | | |
| 03/01/06 | DEFENDANT ON BOND | 00/00/00 | | |
| | BOWIE, JR., PRESTON L. | | | |
| 03/01/06 | WITNESSES ORDERED TO APPEAR | 00/00/00 | | |
| | BOWIE, JR., PRESTON L. | | | |
| 03/01/06 | CONTINUANCE BY AGREEMENT | 03/08/06 | | |
| | BOWIE, JR., PRESTON L. | | | |
| 03/08/06 | DEFENDANT ON BOND | 00/00/00 | | |
| | BOWIE, JR., PRESTON L. | | | |
| 03/08/06 | CONTINUANCE BY AGREEMENT | 04/05/06 | | |
| | BOWIE, JR., PRESTON L. | | | |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 003

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 06CR0076401

    WILLIAM      COZZI

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
04/05/06 DEFENDANT ON BOND                      00/00/00
        KIRBY, JOHN P.
04/05/06 CONTINUANCE BY AGREEMENT               05/11/06
        KIRBY, JOHN P.
05/11/06 DEFENDANT ON BOND                      00/00/00
        BOWIE, JR., PRESTON L.
05/11/06 CONTINUANCE BY AGREEMENT               06/08/06
        BOWIE, JR., PRESTON L.
06/08/06 DEFENDANT ON BOND                      00/00/00
        BOWIE, JR., PRESTON L.
06/08/06 CONTINUANCE BY AGREEMENT               07/14/06
        BOWIE, JR., PRESTON L.
07/14/06 DEFENDANT ON BOND                      00/00/00
        BOWIE, JR., PRESTON L.
07/14/06 CONTINUANCE BY AGREEMENT               08/25/06
        BOWIE, JR., PRESTON L.
08/25/06 DEFENDANT ON BOND                      00/00/00
        BROWN, MICHAEL
08/25/06 SPECIAL ORDER                          00/00/00
        DEFT. MOTION IN LIMMIE
        BROWN, MICHAEL
08/25/06 CONTINUANCE BY AGREEMENT               10/05/06
        BROWN, MICHAEL
10/05/06 DEFENDANT ON BOND                      00/00/00
        BROWN, MICHAEL
10/05/06 DISCOVERY ANSWER FILED                 00/00/00 F        2
        BROWN, MICHAEL
10/05/06 WITNESSES ORDERED TO APPEAR            00/00/00
        BROWN, MICHAEL
10/05/06 CONTINUANCE BY AGREEMENT               11/16/06
        BROWN, MICHAEL
11/16/06 DEFENDANT ON BOND                      00/00/00
        BROWN, MICHAEL
11/16/06 WITNESSES ORDERED TO APPEAR            00/00/00
        BROWN, MICHAEL
11/16/06 CONTINUANCE BY ORDER OF COURT          11/21/06
        BROWN, MICHAEL

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 004

PEOPLE OF THE STATE OF ILLINOIS

                    VS              NUMBER 06CR0076401

 WILLIAM    COZZI

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

| Date | Action | | Date2 | | |
|---|---|---|---|---|---|
| 11/21/06 | DEFENDANT ON BOND | | 00/00/00 | | |
| | BROWN, MICHAEL | | | | |
| 11/21/06 | MOTION IN LIMINE | | 00/00/00 | S | 2 |
| | BROWN, MICHAEL | | | | |
| 11/21/06 | CONTINUANCE BY AGREEMENT | | 01/05/07 | | |
| | BROWN, MICHAEL | | | | |
| 01/05/07 | DEFENDANT ON BOND | | 00/00/00 | | |
| | BROWN, MICHAEL | | | | |
| 01/05/07 | CONTINUANCE BY AGREEMENT | | 01/26/07 | | |
| | BROWN, MICHAEL | | | | |
| 01/26/07 | DEFENDANT ON BOND | | 00/00/00 | | |
| | BROWN, MICHAEL | | | | |
| 01/26/07 | CONTINUANCE BY AGREEMENT | | 02/26/07 | | |
| | BROWN, MICHAEL | | | | |
| 02/26/07 | DEFENDANT IN CUSTODY | | 00/00/00 | | |
| | BROWN, MICHAEL | | | | |
| 02/26/07 | PRISONER DATA SHEET TO ISSUE | | 00/00/00 | | |
| | BROWN, MICHAEL | | | | |
| 02/26/07 | CONTINUANCE BY AGREEMENT | | 03/13/07 | | |
| | BROWN, MICHAEL | | | | |
| 03/13/07 | DEFENDANT IN CUSTODY | | 00/00/00 | | |
| | BROWN, MICHAEL | | | | |
| 03/13/07 | PRISONER DATA SHEET TO ISSUE | | 00/00/00 | | |
| | BROWN, MICHAEL | | | | |
| 03/13/07 | WITNESSES ORDERED TO APPEAR | | 00/00/00 | | |
| | BROWN, MICHAEL | | | | |
| 03/13/07 | CONTINUANCE BY AGREEMENT | | 05/10/07 | | |
| | BROWN, MICHAEL | | | | |
| 05/10/07 | DEFENDANT ON BOND | | 00/00/00 | | |
| | BROWN, MICHAEL | | | | |
| 05/10/07 | PLEA OF GUILTY | C016 | 00/00/00 | | |
| | BROWN, MICHAEL | | | | |
| 05/10/07 | JURY WAIVED | | 00/00/00 | | |
| | BROWN, MICHAEL | | | | |
| 05/10/07 | FINDING OF GUILTY | C016 | 00/00/00 | | |
| | BROWN, MICHAEL | | | | |
| 05/10/07 | DEF SENTENCED TO PROBATION | C016 | 00/00/00 | | |
| | MISDEMENOR PROBATION | | | | |
| | 18 MTH | | | | |
| | BROWN, MICHAEL | | | | |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS     Page 005

PEOPLE OF THE STATE OF ILLINOIS

                    VS              NUMBER 06CR0076401

   WILLIAM     COZZI

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
05/10/07 DEF DEMAND FOR TRIAL                    00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C001 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C002 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C003 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C004 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C005 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C006 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C007 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C005 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C006 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C007 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C008 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C009 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C010 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C011 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C012 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C013 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C014 00/00/00
        BROWN, MICHAEL
05/10/07 NOLLE PROSEQUI                   C015 00/00/00
        BROWN, MICHAEL

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS    Page 006

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 06CR0076401

    WILLIAM    COZZI

        CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
05/10/07 NOLLE PROSEQUI                    C017 00/00/00
      BROWN, MICHAEL
05/10/07 FINES COSTS FEES PER DRFT ORD                              $    680
      BROWN, MICHAEL
05/10/07 PAYMENT RECEIVED - BOND DEDUCT            00/00/00
      FINES TO BE TAKEN OUT OF DEFENDANT BOND
      BROWN, MICHAEL
05/10/07 DEF ADVISED OF RIGHT TO APPEAL            00/00/00
      BROWN, MICHAEL
05/10/07 CHANGE PRIORITY STATUS        M    00/00/00
      BROWN, MICHAEL
07/16/07 PAYMENT RECEIVED - BOND DEDUCT            00/00/00        $    680
07/16/07 CBR PROCSED FRWD ACCT DEP                 00/00/00

                        I hereby certify that the foregoing has
                        been entered of record on the above
                        captioned case.
                        Date 02/05/08

                        _____ Dorothy Brown _____
                              DOROTHY BROWN
                        CLERK OF THE CIRCUIT COURT OF COOK COUNTY

                              T.E.D

BEFORE THE POLICE BOARD OF THE CITY OF CHICAGO

| | |
|---|---|
| IN THE MATTER OF CHARGES FILED AGAINST ) | |
| POLICE OFFICER WILLIAM J. COZZI, ) | No. 06 PB 2604 |
| STAR No. 4129, DEPARTMENT OF POLICE, ) | |
| CITY OF CHICAGO, ) | |
| ) | |
| RESPONDENT ) | (CR No. 307992) |

FINDINGS

On April 03, 2006, the Superintendent of Police filed with the Police Board of the City of Chicago charges against Police Officer William J. Cozzi, Star No. 4129 (hereinafter sometimes referred to as "Respondent"), seeking his discharge for violating the following Rules of Conduct:

Rule 1:    Violation of any law or ordinance.

Rule 2:    Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department.

Rule 6:    Disobedience of an order or directive, whether written or oral.

Rule 8:    Disrespect to or maltreatment of any person, while on or off duty.

Rule 9:    Engaging in any unjustified verbal or physical altercation with any person, while on or off duty.

Rule 14:   Making a false report, written or oral.

The Police Board caused a hearing on these charges against Police Officer William J. Cozzi to be had before Thomas E. Johnson, Hearing Officer of the Police Board, on July 10 and August 17, 2007.

Following the hearing, the members of the Police Board read and reviewed the certified transcription of the hearing and viewed the video-recording of the hearing. Thomas E. Johnson,

Police Board Case No. 06 PB 2604
Police Officer William J. Cozzi
Page 2

Hearing Officer, made an oral report to and conferred with the Police Board before it rendered a decision.

The Police Board of the City of Chicago, as a result of its hearing of the charges, finds and determines that:

1.    The Respondent was at all times mentioned herein employed as a police officer by the Department of Police of the City of Chicago.

2.    The charges were filed in writing and a Notice, stating the time, date, and place, when and where a hearing of the charges was to be held, together with a copy of the original charges, was served upon the Respondent more than five (5) days prior to the hearing on the charges.

3.    The Respondent appeared throughout the hearing and was represented by legal counsel.

4.    The Respondent, Police Officer William J. Cozzi, Star No. 4129, charged herein, is **guilty** of violating, to wit:

Rule 1:    Violation of any law or ordinance.

in that:

> Count I: On or about August 2, 2005, at or near Norwegian American Hospital at 1044 North Francisco Avenue, Chicago, he committed the offense of Aggravated Battery in that he, intentionally or knowingly without legal justification, caused bodily harm to Randle Miles by striking Miles about the head and/or body with a "blackjack" and/or "flat sap" and/or bludgeon, in violation of 720 ILCS 5/12-4(b)(1).
>
> Count II: On or about August 2, 2005, at or near Norwegian American Hospital at 1044 North Francisco Avenue, Chicago, he committed the offense of Aggravated Battery in that he, intentionally or knowingly without legal justification, caused bodily harm to Randle Miles by striking Miles about

Police Board Case No. 06 PB 2604
Police Officer William J. Cozzi
Page 3

the head and/or body while Miles was on or about a public
way, public property, or public place of accomodation, in
violation of 720 ILCS 5/12-4(b)(8).

Count III: On or about August 2, 2005, at or near Norwegian
American Hospital at 1044 North Francisco Avenue, Chicago,
he committed the offense of Battery in that he,
intentionally or knowingly without legal justification,
caused bodily harm to Randle Miles by striking Miles about
the head and/or body, in violation of 720 ILCS 5/12-3(a)(1).

Count IV: On or about August 2, 2005, at or near Norwegian
American Hospital at 1044 North Francisco Avenue, Chicago,
he committed the offense of Battery in that he,
intentionally or knowingly without legal justification, made
physical contact of an insulting or provoking nature with
Randle Miles by striking Miles about the head and/or body,
in violation of 720 ILCS 5/12-3(a)(2).

5.    The Respondent, Police Officer William J. Cozzi, Star

No. 4129, charged herein, is **guilty** of violating, to wit:

Rule 2:    Any action or conduct which impedes the
Department's efforts to achieve its policy and
goals or brings discredit upon the Department.

in that:

Count I: On or about August 2, 2005, at or near Norwegian
American Hospital at 1044 North Francisco Avenue, Chicago,
he struck Randle Miles about the head and/or body with a
"blackjack" and/or "flat sap" and/or bludgeon.

Count II: On or about August 2, 2005, at or near Norwegian
American Hospital at 1044 North Francisco Avenue, Chicago,
while on duty, he used and/or was in possession of a weapon
that is not prescribed by the Chicago Police Department.

Count III: On or about August 2, 2005, he generated one or
more reports containing false information concerning his
arrest of Randle Miles.

6.    The Respondent, Police Officer William J. Cozzi, Star

No. 4129, charged herein, is **guilty** of violating, to wit:

Cozzi                                            00068

Police Board Case No. 06 PB 2604
Police Officer William J. Cozzi
Page 4

    <u>Rule 6</u>:    Disobedience of an order or directive, whether written or oral.

in that:

    On or about August 2, 2005, at or near Norwegian American Hospital at 1044 North Francisco Avenue, Chicago, while on duty, he used and/or was in possession of a weapon that is not prescribed by the Chicago Police Department, in violation of General Order 98-10-03, paragraph II(G) and III(C).

    7.    The Respondent, Police Officer William J. Cozzi, Star No. 4129, charged herein, is **guilty** of violating, to wit:

    <u>Rule 8</u>:    Disrespect to or maltreatment of any person, while on or off duty.

in that:

    On or about August 2, 2005, at or near Norwegian American Hospital at 1044 North Francisco Avenue, Chicago, he struck Randle Miles about the head and/or body with a "blackjack" and/or "flat sap" and/or bludgeon.

    8.    The Respondent, Police Officer William J. Cozzi, Star No. 4129, charged herein, is **guilty** of violating, to wit:

    <u>Rule 9</u>:    Engaging in any unjustified verbal or physical altercation with any person, while on or off duty.

in that:

    On or about August 2, 2005, at or near Norwegian American Hospital at 1044 North Francisco Avenue, Chicago, he struck Randle Miles about the head and/or body with a "blackjack" and/or "flat sap" and/or bludgeon.

    9.    The Respondent, Police Officer William J. Cozzi, Star No. 4129, charged herein, is **guilty** of violating, to wit:

    <u>Rule 14</u>:  Making a false report, written or oral.

Police Board Case No. 06 PB 2604
Police Officer William J. Cozzi
Page 5

in that:

    On or about August 2, 2005, he generated one or more reports containing false information concerning his arrest of Randle Miles.

10. The Respondent's complimentary history includes thirty-two Honorable Mentions, seven Complimentary Letters, and other awards, and the Respondent's disciplinary history contains no sustained complaints.

By reason of the findings of fact and guilt herein, and taking into account the Respondent's complimentary and disciplinary histories, cause exists for the suspension of the Respondent, Police Officer William J. Cozzi, Star No. 4129, from his position as a police officer with the Department of Police, and from the services of the City of Chicago, for a period of two (2) years, from April 04, 2006, to and including April 03, 2008.

Respectfully submitted,

THOMAS E. JOHNSON
Hearing Officer

Police Board Case No. 06 PB 2604
Police Officer William J. Cozzi
Page 6

## DECISION

The Police Board of the City of Chicago, having read and reviewed the certified transcription of the hearing, having viewed the video-recording of the hearing, having received the oral report of the Hearing Officer, Thomas E. Johnson, and having conferred with the Hearing Officer on the credibility of the witnesses and the evidence, hereby adopts all findings herein; and, in reaching its decision as to the penalty imposed, the Board has taken into account not only the facts of this case but also the Respondent's complimentary and disciplinary histories, copies of which are attached hereto as Exhibit A; and

**IT IS HEREBY ORDERED** that the Respondent, Police Officer William J. Cozzi, Star No. 4129, as a result of having been found **guilty** of charges in Police Board Case No. 06 PB 2604, be and hereby is **suspended** from his position as a police officer, and from the services of the City of Chicago, for a period from 04 April 2006 to and including  03 April 2008 (two years)            .

DATED AT CHICAGO, COUNTY OF COOK, STATE OF ILLINOIS, THIS 18th DAY OF OCTOBER, 2007.

Attested by:

Executive Director
Police Board

Police Board Case No. 06 PB 2604
Police Officer William J. Cozzi
Page  7

<u>DISSENT</u>

The following members of the Police Board hereby dissent from the decision of the majority of the Board.

The undersigned voted to order that the Respondent be discharged from his position as a police officer.

_____

_____

_____

_____

RECEIVED A COPY OF

THE FOREGOING COMMUNICATION

THIS ___1ST___ DAY OF _NOVEMBER_____ , 2007.

_____
INTERIM SUPERINTENDENT OF POLICE

Cozzi                                    00072

**Westlaw.**

1/22/08 CHISUN 7

**News**Room

Page 1

1/22/08 Chi. Sun-Times 7
2008 WLNR 3388861

Chicago Sun Times (IL)
Copyright 2008 Chicago Sun-Times, Inc.

**January 22, 2008**

Section: News

Taped beating a campaign issue
Candidate says opponent backed reducing the charge, but she denies it

Rosalind Rossi

Two top prosecutors vying to be the next Cook County state's attorney ripped into each other Monday over a decision to drop felony charges against a Chicago Police officer captured on tape pummeling a man shackled to a wheelchair.

Chief Deputy State's Attorney Anita Alvarez said she never supported bargaining the case down to misdemeanor battery during a meeting with State's Attorney Dick Devine that included one of her opponents for Devine's job, First Assistant Robert Milan.

"As I remember it, I said I didn't agree," Alvarez said. "It was under Mr. Milan's advisement that this would be a good disposition of the case. . . .

"I never advised the state's attorney to reduce this from a felony. This is a perfect example of why I am running for state's attorney," Alvarez said. "Sound judgment won't become overruled when I am state's attorney."

Alvarez said she was "outraged" when she first saw the 2005 beating in a video that was obtained by the Chicago Sun-Times under a Freedom of Information Act request and posted Monday on the newspaper's Web site.

Milan, whom Devine endorsed in the Democratic primary, insisted Alvarez "absolutely approved" of the deal, which was recommended by prosecutors on the case.

Her claims to the contrary are "nothing but sour grapes, because ever since Dick Devine endorsed me, these are the types of things she's doing," Milan said.

Considering the facts, Milan said, a plea to misdemeanor battery with 18 months probation and counseling was appropriate. But, he said, Officer **William Cozzi** should be fired for the attack on Randle Miles, now 62, at Norwegian American Hospital.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Instead, the Police Board, which decides police discipline, gave Cozzi a two-year unpaid suspension. The Police Department has appealed, seeking termination.

Authorities have said Miles was intoxicated, verbally abusive and waiting in a wheelchair to be treated for a shoulder stab wound when police were called.

During the arrest, Cozzi handcuffed Miles to the wheelchair, and when Miles resisted, Cozzi retrieved leg shackles from his police car, prosecutors said previously.

The tape shows Cozzi shackling Miles' legs to the wheelchair and striking him about 10 times. Prosecutors have said Cozzi also used a small nightstick on Miles.

Milan called Cozzi's actions "despicable" but said Cozzi had no disciplinary record, earned 32 honorable mentions and served honorably in the Air Force.

Miles "was so out of it, he didn't even remember it happening," Milan said. Miles agreed to drop felony official misconduct charges against Cozzi, he said.

Ald. Tom Allen [38th] was among several Democratic candidates Monday to say they would have handled things differently. Allen said the case should have gone to trial as originally charged.

"I think that the justice system should determine the outcome of this case, rather than someone in the state's attorney's office reducing the offense," Allen said.

Cook County Commissioner Larry Suffredin said any misdemeanor deal should have included Cozzi's agreement to leave the Police Department, and "If [Cozzi] chose not to take the deal, then you try the felony case."

Ald. Howard Brookins [21st] questioned how an officer accused of "beating a 62-year-old defenseless person, handcuffed to a wheelchair" could plead to only a misdemeanor.

"When I'm state's attorney," Brookins said, "nobody will be treated above or below the law."

---- INDEX REFERENCES ----

REGION:  (USA (1US73); Americas (1AM92); Illinois (1IL01); North America (1NO39))

Language:  EN

OTHER INDEXING:  (AIR FORCE; AMERICAN HOSPITAL; DEMOCRATIC; POLICE BOARD; POLICE DEPARTMENT) (Allen; Alvarez; Anita Alvarez; Brookins; Chief Deputy State; Cozzi; Devine; Dick Devine; Howard Brookins; Larry Suffredin; Tom Allen; William Cozzi)

EDITION: Final

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

```
Word Count: 677
1/22/08 CHISUN 7
END OF DOCUMENT
```

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.                                                           NewsRoom

1/21/08 CHISUN 5                                                   Page 1


1/21/08 Chi. Sun-Times 5
2008 WLNR 3388670

Chicago Sun Times (IL)
Copyright 2008 Chicago Sun-Times, Inc.

**January 21, 2008**


Section: News


Another black eye
Cop caught on tape beating man in wheelchair could be back on the beat in April.
Now, Chicago's new top cop says he will take a 'hard, close look' at the case


Frank Main

New Chicago Police Supt. Jody Weis will take a "hard, close look" at taking fur-
ther action against an officer suspended after a surveillance camera captured him
beating a man handcuffed and shackled to a wheelchair, a police spokeswoman says.

Officer **William** J. **Cozzi** is one of three officers who pleaded guilty last year to
misdemeanor battery for beating people in 2005. Surveillance cameras recorded each
of the separate incidents.

Cozzi, 50, is scheduled to return to work in April after completing a suspension.

The matter is "a concern" for Weis, an FBI veteran who takes office as superin-
tendent Feb. 1 and has vowed to crack down on police misconduct, police spokeswo-
man Monique Bond said.

"This is a case he will be taking a hard, close look at for further action," Bond
said. "Supt. Weis has requested a briefing and will review the matter."

The video of Cozzi beating a wheelchair-bound hospital patient was entered into
evidence at his disciplinary hearing before the Chicago Police Board in July and
August.

The Chicago Sun-Times obtained a copy of the video through a Freedom of Informa-
tion request.

The soundless video shows Randle Miles, now 62, sitting in a wheelchair in the
lobby of the emergency room at Norwegian-American Hospital in the Humboldt Park
neighborhood on the Northwest Side.

Miles was in the hospital for a stab wound to the shoulder. He apparently was in-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

toxicated, uncooperative with the hospital's staff and verbally abusive to officers when they were called, authorities say.

A 42-second snippet of video shows Cozzi, who was on duty, shackling Miles' legs to the wheelchair, then striking Miles about 10 times -- finishing with a roundhouse blow.

Cook County prosecutors have said Cozzi struck Miles with a "blackjack" -- a small baton.

Miles required stitches, said his attorney, Timothy Whiting, whose law firm obtained a $125,000 settlement from the city. "He is harmless," Whiting said of Miles.

Cozzi couldn't be reached for comment, but his attorney, William Fahy, said his client is "extremely remorseful of his conduct."

"The Police Board heard all the evidence and found him guilty of his conduct," Fahy said. "They considered his many, many years as a police officer. Based on the evidence, they made the right call. He deserves a second chance."

Cozzi was sentenced to 18 months' probation in his criminal case. He also was found guilty of violating Police Department rules. But the Police Board, which considers disciplinary action against cops, rejected the department's recommendation to fire Cozzi. Instead, Cozzi was given a two-year, unpaid suspension.

The board voted 6-2 that Cozzi deserved a suspension because he earned 32 honorable mentions and other awards during his 15-year career and didn't have a disciplinary history. Board President Demetrius Carney was one of the dissenting votes. He didn't return a call seeking comment.

In November, the Police Department filed an appeal in court, seeking to have Cozzi fired.

Disciplinary proceedings are pending against two other officers, Larry Guy Jr. and Alexandra Martinez, in separate 2005 beatings. Both pleaded guilty to misdemeanor battery. Neither case has been ruled on by the Police Board.

Guy, 40, was charged with punching a handcuffed shoplifting suspect at a Target near California and Addison. The city paid Armando Lucas $92,500 to settle a lawsuit against Guy, records show.

Martinez, 39, was accused of slamming a 14-year-old girl's head against a wall and punching her in the face. The girl was a shoplifting suspect in a JC Penney at 76th and Cicero.

---- INDEX REFERENCES ----

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

COMPANY: JC PENNEY CO INC

NEWS SUBJECT:   (Legal (1LE33))

REGION:   (USA (1US73); Americas (1AM92); Illinois (1IL01); North America (1NO39))

Language:   EN

OTHER INDEXING:   (AMERICAN HOSPITAL; BOARD; CHICAGO POLICE BOARD; FBI; JC PENNEY; NEW CHICAGO POLICE SUPT; POLICE BOARD; POLICE DEPARTMENT; SUPT)   (Alexandra Martinez; Bond; Cozzi; Demetrius Carney; Fahy; Guy; Jody Weis; Larry Guy Jr.; Martinez; Monique Bond; Timothy Whiting; Weis; Whiting; William Fahy; William J. Cozzi)

EDITION: Final

Word Count: 712
1/21/08 CHISUN 5
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

4/4/08 KRT-CHITRIB (No Page)

NewsRoom

Page 1

4/4/08 Chicago Tribune (KRTBN) (Pg. Unavail. Online)
2008 WLNR 6367117

                    Chicago Tribune (KRT)
              Copyright 2008 Chicago Tribune

                         **April 4, 2008**

         Beating in wheelchair by Chicago cop leads to federal indictment
                              Angela Rozas
                            Chicago Tribune

    Apr. 4--A Chicago police officer was indicted this week on a federal charge
of violating the civil rights of a man beaten while handcuffed to a wheelchair, an
incident that was caught on videotape.

A federal grand jury indicted  **William   Cozzi** , 50, on one count of violating
the man's civil rights during an arrest at a Chicago hospital in August 2005, ac-
cording to the U.S. attorney's office. Cozzi will be arraigned at a later date.

"Every citizen, regardless of being in police custody, has a constitutional right
to be free from the use of unreasonable force by law enforcement officers," U.S.
Atty. Patrick Fitzgerald said in a statement.

Cozzi pleaded guilty last year to misdemeanor battery in Cook County Circuit Court
for the beating and was given 18 months' probation and ordered to undergo anger
management classes.

Cozzi, who worked in the Police Department's Grand-Central District at the time of
the beating, was suspended from the department for two years. The department filed
an appeal in November in Cook County court to get Cozzi fired.

Supt. Jody Weis said in January that he was looking into the case to determine if
more needed to be done. On Thursday, a spokeswoman for the department said Weis
referred the case to the FBI and that Cozzi remains on unpaid leave from the de-
partment and "will not return to duty."

The indictment stems from an incident involving Randle Miles, who was being
treated for stab wounds at Norwegian American Hospital when he resisted being
placed in the wheelchair, according to reports.

Cozzi, who had been dispatched to the hospital to speak with Miles, became enraged
by his behavior, Cook County prosecutors said.

Cozzi placed the man in handcuffs and said, "Don't move, or I'll break your
[expletive] wrists," prosecutors said after Cozzi's arrest. Cozzi hit the man 10

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Page 2

times with a small club in the face and torso, prosecutors said.

Miles sued and eventually won a $125,000 settlement from the city.

arozas@tribune.com

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Legal (1LE33); Judicial (1JU36); Social Issues (1SO05); Police
(1PO98); Government Litigation (1GO18); Economics & Trade (1EC26))

REGION:  (USA (1US73); Americas (1AM92); Illinois (1IL01); North America (1NO39))

Language:  EN

OTHER INDEXING:  (AMERICAN HOSPITAL; COOK COUNTY; COOK COUNTY CIRCUIT COURT; FBI;
POLICE DEPARTMENT)  (Cozzi; Jody Weis; Patrick Fitzgerald; Weis; William Cozzi)

Word Count: 393
4/4/08 KRT-CHITRIB (No Page)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:08-cr-00276   Document 1   Filed 04/02/2008   Page 1 of 1

**F I L E D**

APR - 2 2008

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. **08CR 276** |
| v. | ) | |
| WILLIAM COZZI, | ) | Violation: Title 18, United States Code, Section 242. |
| | ) | **JUDGE MANNING** |

**MAGISTRATE JUDGE COLE**

The SPECIAL MARCH 2007 GRAND JURY charges:

On or about August 2, 2005, at Chicago, in the Northern District of Illinois, Eastern Division,

WILLIAM COZZI,

defendant herein, an Officer of the Chicago Police Department, while acting under color of law, used a dangerous weapon to strike Victim A repeatedly, while Victim A was handcuffed and shackled in a wheelchair at Norwegian American Hospital, resulting in bodily injury to Victim A, thereby willfully depriving Victim A of a right secured and protected by the Constitution and laws of the United States, that is, the right to be free from the use of unreasonable force by a person acting under color of law;

In violation of Title 18, United States Code, Section 242.

A TRUE BILL:

_____
FOREPERSON

_____
UNITED STATES ATTORNEY

Westlaw.

1/23/08 CHISUN 6

1/23/08 Chi. Sun-Times 6
2008 WLNR 3388984

Chicago Sun Times (IL)
Copyright 2008 Chicago Sun-Times, Inc.

**January 23, 2008**

Section: News

Not sure 'if I was going to live or die'
Shackled to wheelchair, hit by officer

Frank Main

First, Randle Miles was beaten by a Chicago Police officer while handcuffed and shackled to a wheelchair.

Then Miles, 60 at the time, was charged with resisting arrest, assault and battery, his lawyer said.

But a hospital video of the 2005 incident shows Miles did not resist while Officer **William Cozzi** hit him about 10 times.

"I was beaten, then I was charged with a crime," Miles said in an interview Tuesday. "I don't understand it."

His attorney, Timothy Whiting, called it "a complete miscarriage of justice."

Whiting said Miles went to court on the criminal charges, but Cozzi and hospital guards did not appear. Prosecutors tried to re-schedule the hearing but a judge dismissed the case, Whiting said.

Cozzi, 50, pleaded guilty to misdemeanor battery in May 2007 and got 18 months' probation.

COP BACK ON JOB IN APRIL

The Sun-Times first reported Monday that incoming police Supt. Jody Weis is unhappy that Cozzi was not fired, calling the officer's actions "deplorable."

The department sought to fire Cozzi. But the Chicago Police Board, which considers discipline against cops, gave him an unpaid suspension -- even though it found him guilty of beating Miles and filing a false police report.

The board said Cozzi deserved to keep his job because he did not have a disciplin-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

ary history and won numerous awards. He is due to return to work in April.

Weis said he will "review the facts of the case before taking further action" against Cozzi. Cozzi's attorney says his client is remorseful and deserves a second chance.

The beating occurred after Miles was taken to Norwegian American Hospital with a stab wound. He gave a nurse an insurance card and grew agitated when she quizzed him about his personal information, Whiting said.

Miles asked for a doctor, but the nurse told Miles to quiet down, then called hospital guards, Whiting said. Miles continued to complain, and Chicago Police were called.

Miles, who had drank a pint of gin, was passive when Cozzi shackled him to the wheelchair and struck him repeatedly as guards watched, Whiting said.

Miles said he was in a fog of alcohol and medication and can't remember details of the beating, but recalls "a man beating on me and not knowing if I was going to live or die."

The Sun-Times was the first to publicly post the video on the Internet, at sun times.com. The newspaper obtained a copy under the Freedom of Information Act.

---- INDEX REFERENCES ----

REGION:  (USA (1US73); Americas (1AM92); Illinois (1IL01); North America (1NO39))

Language:  EN

OTHER INDEXING:  (AMERICAN HOSPITAL; CHICAGO POLICE; CHICAGO POLICE BOARD; COP) (Cozzi; Jody Weis; Miles; Prosecutors; Randle; Timothy Whiting; Weis; Whiting; William Cozzi)

EDITION: Final

Word Count: 476
1/23/08 CHISUN 6
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.